UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
CP III RINCON TOWERS, INC.,

                      Plaintiff,
                                              10 Civ. 4638 (DAB)
            v.                                   OPINION

RICHARD COHEN,

                      Defendant.
--------------------------------------X
DEBORAH A. BATTS, United States District Judge.

     Plaintiff CP III Rincon Towers, Inc. ("CP III" or "Plaintiff")
filed this action against Defendant Richard Cohen ("Cohen" or
"Defendant") seeking recovery from Defendant under a guaranty (the
"Guaranty") he signed.  Plaintiff now moves for summary judgment on
the issue of Defendant's liability under the Guaranty.  Defendant
cross-moves for summary judgment on Plaintiff's claims.  For the
reasons set forth herein, Plaintiff's Motion for Summary Judgment is
DENIED, and Defendant's Motion for Summary Judgment is GRANTED.


I.   BACKGROUND

     A.   The Loan

          1.   The Property and the Loan's Successors

     In 2005, Beacon Capital Partners ("Beacon") purchased a mixed-
use development project in San Francisco ("the Project").  (Def.'s
56.1 Stmt. ¶¶ 6-8.) The Project included a high-rise apartment
building ("the Property") with 320 units that Beacon intended to
convert into condominium units.  (Id. ¶¶ 6-7.) The Property owner
was a part of the Project's real estate owners' association
("REOA"), which required payment of association fees.  (Pl.'s 56.1
Stmt. ¶ 22.)

Defendant serves as president of Rincon EV Realty LLC, Rincon ET Realty LLC, and Rincon Residential Towers LLC (collectively, "Rincon" or "Borrower"). (Id ¶¶ 3-4.) In 2007, Beacon awarded Rincon the right to purchase the Property. (Def.'s 56.1 Stmt. ¶ 11.) Cohen then requested that Ben Milde ("Milde"), a senior managing director at Bear Stearns Commercial Mortgage, Inc. ("Bear Stearns" or, together with its successors in interest, "Lender"), send him a preliminary quote for financing the Property with a $110 million loan; Milde did so on May 17, 2007. (Id. ¶ 16.) The next day Defendant stated he would finance with Bear Stearns if it could close by the end of the month. (Id. ¶ 16.)

On June 8, 2007, Rincon and Bear Stearns entered into a $110 million Loan Agreement ("Loan" or "Loan Agreement"). (Pl.'s 56.1 Stmt. ¶ 7.) The final purchase price of the Property was $143 million with Rincon paying approximately $153.6 million, including closing costs. (Def.'s 56.1 Stmt. ¶¶ 12-13.) Borrower fulfilled payment using the $110 million Loan as well as its own reserves. (Id. ¶ 13.) To effectuate the transfer of the Property and the Loan, Rincon also executed a Deed of Trust, Promissory Note, Security Agreement and Allonge on June 8, 2007.[1] (Id. ¶ 57; Pl.'s 56.1 Stmt. ¶ 8.) That same day, Defendant, in his individual capacity, entered into the Guaranty with Bear Stearns in which he assumed liability for payment of the Loan Agreement under certain circumstances.

---

[1] An allonge is the transfer of a promissory note. It is customary to send blank allonges to the custodian so the custodian would complete it if the note is transferred. (Furka Decl. Ex. 35, McInerney Dep. 103.)

(Pl.'s 56.1 Stmt. ¶ 8.)

In early 2008, the Federal Reserve agreed to facilitate a merger between Bear Stearns and JP Morgan & Chase Co.  (Def.'s 56.1 Stmt. ¶ 61.) In connection with the merger, the Federal Reserve created Maiden Lane LLC ("Maiden Lane"), which acquired the Property at issue here.  (Id. ¶¶ 62-63.) BlackRock Financial Management Inc. ("BlackRock") became Maiden Lane's investment manager and operating adviser.  (Id. ¶ 64.)

On February 5, 2010, BlackRock and Maiden Lane selected Carmel Partners Inc. as the winning bidder to purchase the Loan.  (Id. ¶ 169.) Plaintiff CP III is a special purpose entity that was formed to facilitate the acquisition of the Loan.  (Id. ¶ 2.) On April 16, 2010, CP III purchased the Loan for approximately $83 million, and it took assignment of the Loan, Promissory Note, Deed of Trust, Guaranty, Security Agreement and Allonge.[2]  (Id. ¶¶ 172-73; Pl.'s 56.1 Stmt. ¶ 73.)

_____

[2] Although Cohen asserts CP III is not Lender's successor-in-interest due to gaps in the Loan's chain of title, Defendant only provides an email attachment with a purported allonge to demonstrate this alleged defect.  (Furka Decl. Ex. 72.) There is, however, overwhelming evidence that the attachment was made in error.  Bear Stearns executed an Omnibus Assignment, assigning the Loan to U.S. Bank as trustee for the Maiden Lane Trust.  (Def.'s 56.1 Stmt. ¶ 63; Forastiere Decl. Ex. 1.) Additionally, the email attachment does not include a date associated with the purported allonge's execution.  (Furka Decl. Ex. 72) Once that purported allonge was discovered, it was immediately corrected.  (Id. Exs. 72, 126, 159.) Moreover, PWR-17 expressly denies having ever owned the Loan.  (Jacobs Decl. ¶¶ 4-10.) This denial is supported by the fact that the Loan never was listed as one of PWR-17's assets. (Id. ¶ 11.) No reasonable trier of fact could find that the Allonge was assigned to PWR-17 via that email attachment. Accordingly, CP III is the successor-in-interest to Bear Stearns.

2.   Drafting of the Loan

Bear Stearns, Cohen, and Rincon retained national law firms to represent them during Loan negotiations.  (Def.'s 56.1 Stmt. ¶¶ 20-21.) James Black ("Black") from Bingham McCutchen LLP was the principal negotiator on behalf of Cohen and Rincon.  (Id. ¶ 21.) Bear Stearns retained Cadwalader, Wickersham & Taft LLP ("Cadwalader").  (Id. ¶ 20.)

Because the Property's net operating income was not believed to be able to cover the anticipated interest on the Loan, as a condition to grant the Loan, Bear Stearns required Cohen's Guaranty.[3]  (Pl.'s 56.1 Stmt. ¶ 21.) During negotiations, Cohen's main concern was what conditions would trigger his full recourse liability under the Guaranty, namely that his full recourse obligations would only be triggered if there was an egregious infraction.  (Id. ¶ 34.) Cohen expressed to Milde that he did not want to be held responsible for actions beyond his control and that he would not sign anything but a bad-boy guaranty.[4]  (Id. ¶ 35.)

---

[3] As part of its intention to convert the Property to condominiums, Beacon did not engage in leasing activity or rent increases, and it let expiring leases become month-to-month leases at the same rate.  (Def.'s 56.1 Stmt. ¶ 9.) As a result, before Rincon purchased the Property, it was only 71% occupied and was generating a net operating income of $2.1 to $3.4 million. (Pl.'s 56.1 Stmt. ¶ 20.)

[4] While there is not a precise meaning of bad-boy guaranty or precise actions that are forbidden under such a guaranty, the concept is not to act badly.  A bad-boy guaranty often forbids fraud, the misallocation of funds, and a voluntary bankruptcy filing, among other prohibitions. (Suppl. Furka Decl. Ex. 3, at 82-83; Furka Decl. Ex. 34, Milde Dep. 86-87; Id. Ex. 35, McInerney Dep. 153-55.)

4

On May 21, 2007, Bear Stearns provided Cohen with a non-binding draft term sheet that provided that the Loan and associated Guaranty would be "non-recourse to Borrower and acceptable Indemnitor with Lender's standard carveouts." (Furka Decl. Ex. 49.) There were two types of carveouts whereby Lender could seek repayment directly from Borrower: loss recourse and full recourse.  Loss recourse means that Borrower would be liable for any losses suffered by Lender as a result of certain events.[5]  If a full recourse carveout is triggered, Borrower is liable for the entire amount of the debt, not just the loss incurred.  Bear Stearns' standard full recourse carveouts were for "bad boy acts such as fraud, misrepresentation, . . . misallocation of funds," and "unpermitted indebtedness." (Furka Decl. Ex. 34, Milde Dep. 86-87.)  If a recourse event was triggered and Rincon failed to pay, Cohen would be liable under the Guaranty.

On May 22, 2007, Bear Stearns' counsel distributed initial drafts of the Loan documents. (Def.'s 56.1 Stmt. ¶ 22.) The Guaranty's first draft provided that the "failure to pay charges for labor or materials or other charges that can create Liens on any portion of the Property" would result in Defendant being liable for any incurred loss. (Furka Decl. Ex. 51, at 239.) The draft also delineated what actions would trigger Cohen's full recourse liability, including, <u>inter alia</u>, the Indebtedness, voluntary Lien,

---

[5] Plaintiff does not allege that Rincon or Cohen's loss recourse liability was triggered, nor can the Court find any situation in which Cohen would be liable for loss recourse, especially after the Property's foreclosure.

SPE, and Transfer Provisions.[6]  (<u>Id.</u> at 240.) On May 24, 2007, Black
responded to the draft; he stated that, at a conference call
scheduled for later that day, he would like to discuss his proposal
that the "[o]nly full recourse item should be bankruptcy events –
the others, e.g., failure to obtain Lender's consent to unpermitted
Indebtedness or voluntary Liens; unpermitted Transfers; breach of
SPE provisions . . . should trigger recourse only to extent of
damage suffered by lender" and that "mechanics' liens should not be
a recourse occurrence." (<u>Id.</u> Ex. 52, at 754.)

Black provided comments on the initial Loan draft on May 29,
2007. (Def.'s 56.1 Stmt. ¶ 24.) He again proposed striking the
provision that would allow for loss recourse arising from a "failure
to pay charges for labor or materials or that can create Liens on
any portion of the Property." (Furka Decl. Ex. 53, at 863.) He also
proposed moving the full recourse carve-outs for the Indebtedness,
voluntary Lien, Transfer, and SPE Provisions so they only would
trigger loss recourse. (<u>Id.</u> at 863.) The next day, Black circulated
comments on the Guaranty, which made the same proposals. (<u>Id.</u> Ex.
54, at 1006.)

On May 31, 2007, Cadwalader circulated a revised draft, which
deleted the provision that provided for loss recourse for failure to

---

[6] The Court shall refer to the recourse provisions at issue
for resolving the instant Motions as the Indebtedness Provision,
the voluntary Lien Provision, the Transfer Provision, and the SPE
Provision.  <u>See</u> Guaranty ¶ 1.2(a),(b).  Additionally, the Loan
defines "SPE" as Special Purpose Entity.  Both Parties agree that
the Guaranty's Single Purpose Entity is the same as the Loan's
Special Purpose Entity.  The Court shall refer to both as SPE.

pay bills that could create liens.[7]  (Id. Ex. 55, at 1230.)  Bear Stearns also accepted Black's proposal to change the SPE Provision to a loss recourse event.  (Id. at 1230-31, 1267-68.) This draft, however, continued to have the Indebtedness, voluntary Lien, and Transfer Provisions trigger full recourse. (Id.)

On June 4, 2007, Black raised concerns with the Guaranty, stating that "compromise language" was needed so that only "unpermitted Indebtedness, Liens and Transfers and Partition Actions will only become full recourse events – for example, if these breaches don't have an MAE [material adverse effect], they should only trigger recourse to the extent of actual loss."  (Id. Ex. 56, at 2051; Peluso Decl. Ex. 5, at 2086.) A Cadwalader attorney responded to the compromise language request, writing, "We don't think [the proposed limitations are] the case, but we will consider language if you wish to propose it."  (Furka Decl. Ex. 57, at 2105.)

Cadwalader circulated revised drafts on June 6, 2007, which rejected Black's proposed material adverse effect limitations. (Def.'s 56.1. Stmt. ¶ 30.) Black provided comments that same day, noting that the Guaranty's Indebtedness, voluntary Lien, and

_____

[7] Defendant asserts, citing to deposition testimony of William McInerney ("McInerney"), an attorney representing Bear Stearns, that this removal meant that Bear Stearns "agreed that liens arising from disputed or unpaid bills would not be a trigger under the Guaranty."  (Def.'s 56.1 Stmt. ¶ 27.) McInerney's testimony, however, discussed his general practice, not the Loan and Guaranty at issue here, and he stated that he did not know why the specific language was removed.  (Furka Decl. Ex. 35, McInerney Dep. 159-77.) He explained it was not his "practice to agree . . . to take out a recourse trigger but then have it put into another section of the Loan Agreement without specifically discussing that with the borrower."  (Id. at 163-64.)

Transfer, and Partition full recourse triggers need "to be discussed with client." (Id. ¶ 30-31; Furka Decl. Ex. 59.) Cadwalader sent further revised drafts the next day. (Def.'s 56.1 Stmt. ¶ 32.) Despite Black's proposal, neither draft included material adverse effect limitations. (Furka Decl. Ex. 8, Black Dep. 107-09.)

On June 7, 2007, Bear Stearns completed its Commitment Committee Memorandum on the Loan, which provided a brief summary of the transaction documents and a table that summarized events that would trigger recourse. (Furka Decl. Ex. 45, at 26.) The table included full recourse carveouts for, inter alia, fraud, misrepresentation, willful misconduct, misappropriation, and voluntary bankruptcy. (Id.) In the table's cell for "other carveouts, it stated "N/A." (Id.) The table also incorrectly listed "gross negligence" as a carveout. (Id.) On June 8, 2007, a revised final closing statement was circulated, which stated that "gross negligence" was not a carve-out but that there were "other" carveouts. (Id. Ex. 61, at 9007-08.) Black responded via email that same morning, commenting:

> In the revised Guaranty and Loan Agreement, unpermitted
> Indebtedness was inserted as a full recourse
> occurrence. I'm not sure why the lender made this
> change, but to the extent it is required by lender,
> such an occurrence should be limited to actual loss or,
> if it is to be a full recourse event, it should be
> limited to "voluntary, material" Indebtedness.

(Peluso Decl. Ex. 6.) That afternoon a conference call was held to discuss the recourse provisions. (Def.'s 56.1 Stmt. ¶ 36.) Another draft was sent on June 8, 2007; ultimately, Black's proposed Indebtedness revisions were not present in the final Guaranty, but

the draft shows for the first time the $250,000 threshold being inserted into the Indebtedness Provision.  (Pl.'s 56.1 Stmt. ¶¶ 45-47; Loan § 9.3(B)(iv); Guaranty ¶ 1.2(b)(iv).)

The Loan, Guaranty, Deed of Trust, Security Agreement, and Allonge were executed on June 8, 2007, with a promissory note evidencing the $110 million debt.  (Def.'s 56.1 Stmt. ¶¶ 54-57.)

### 3.    The Loan and Guaranty Documents

Between June 8, 2007 and the Loan's maturity, Borrower only needed to pay the Loan's interest.  The Loan was scheduled to mature on June 12, 2009, with Borrower having a conditional option for a one year extension.  (Loan § 1.1; Loan § 2.7.)

The Loan was conditionally non-recourse, but some events could trigger either loss or full recourse, whereby Lender could seek repayment directly from Borrower.  (Pl.'s 56.1 Stmt. ¶¶ 16-17.) If Borrower did not meet those obligations, Defendant was liable for payment.  Guaranty ¶ 1.1.  Defendant's loss recourse liability may be triggered, <u>inter alia</u>, by the SPE Provision, which occurs if Borrower fails "to maintain its status as a Single Purpose Entity in accordance with, the terms and provisions of the Loan Agreement or the Deed of Trust."  Guaranty ¶ 1.2(a)(vi).  The loss recourse paragraph omits the mechanic's liens provision, which was included in the original draft.  <u>Compare</u> <u>id.</u> <u>with</u> Furka Decl. Ex. 40. Cohen's full recourse liability is set forth in paragraph 1.2(b) of the Guaranty; the three pertinent triggering events are the Indebtedness Provision, voluntary Lien Provision, and Transfer Provision.  Guaranty ¶ 1.2(b)(iv),(v).

9

The Indebtedness and voluntary Lien Provisions provide that the debt is full recourse against Defendant "if Borrower fails to obtain Lender's prior written consent to any Indebtedness (provided such Indebtedness exceeds $250,000 or if any such Indebtedness is in the form of mezzanine debt or preferred equity) or voluntary Lien encumbering the Property (to the extent such consent is required under the Loan Agreement").  Guaranty ¶ 1.2(b)(iv).  The Loan defines "Indebtedness" to include:

> (a) all indebtedness or liability . . . (including, without limitation, amounts for borrowed money and indebtedness in the form of mezzanine debt or preferred equity) . . . and (g) obligations secured by any Liens, whether or not the obligations have been assumed (other than the Permitted Encumbrances and Permitted Equipment Financing).

Loan § 1.1.  Although the Loan does not define "voluntary" or "voluntary Lien," it defines "Lien" as:

> any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting Borrower, the Property, any portion thereof or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

Loan § 1.1.

The Transfer Provision provides for full recourse "if Borrower fails to obtain Lender's prior written consent to any Transfer if required by the Loan Agreement or the Deed of Trust."  Guaranty ¶ 1.2(b)(v).  The Loan states that a Transfer will occur if Borrower,

> [w]ithout the prior written consent of Lender, . . . sell, convey, mortgage, grant, bargain, encumber,

10

> pledge, assign, grant options with respect to, or
> otherwise transfer or dispose of (directly or
> indirectly, voluntarily or involuntarily, by operation
> of law or otherwise, and whether or not for
> consideration or of record) the Property or any part
> thereof or any legal or beneficial interest therein.

Loan § 5.2.10(b).

Concerning Rincon's obligation to make payments under the REOA, Rincon was required to "pay all charges and other sums to be paid by Borrower pursuant to the terms of the REOA as the same shall become due and payable and prior to the expiration of any applicable grace period therein provided." Loan § 5.1.24(b). The Deed of Trust contains a similar provision regarding mechanic's liens. Deed of Trust § 3.6(a).

Finally, the Loan specifies that it is governed by New York law, with the exception that "the provisions for the creation, perfection, and enforcement of the lien and security interest created pursuant hereto and pursuant to the other loan documents shall be governed by" California law.[8] Loan § 10.3.

B.   Events Leading to Foreclosure

1.   Rincon's Attempt to Extend the Maturity Date

In March 2008, Lender, Rincon, and Cohen engaged in unsuccessful negotiations aimed at amending the Loan. (Pl.'s Resp. to Def.'s 56.1 Stmt. ¶ 115.) In a letter dated, March 5, 2009,

---

[8]   Although Defendant contends New York Real Property Actions and Proceeding Law ("RPAPL") section 1371 applies and prohibits Plaintiff's recovery in the instant suit, California law governs the foreclosure proceedings and Defendant's anti-deficiency protections.  See Guaranty ¶¶ 5.16-5.19; Loan § 10.3.

Borrower notified Bear Stearns and BlackRock that it wanted to extend the Initial Maturity Date.

On June 24, 2009 Bank of America, on behalf of Lender, sent Rincon a notice of default, asserting the Loan was not extended because Borrower failed to comply with Loan's extension conditions. (Furka Decl. Ex. 77.) Rincon replied two days later, explaining it believed it complied with those requirements. (Id. Ex. 78.) During the fall and summer of 2009, Maiden Lane, Rincon, and Cohen attempted to negotiate new Loan terms; given those negotiations, Maiden Lane did not enforce its rights on the default. (Peluso Decl. Ex. 80, Leese Decl. ¶ 15.) Negotiations failed. (Id. ¶ 22.)

2.   The Liens That Allegedly Triggered Defendant's Full
Recourse Obligations

When Rincon entered into the Loan, Lender was aware that it would commence construction at the Property, and the Loan required Rincon to perform certain renovations to the Property. (Def.'s 56.1 Stmt. ¶ 105; Loan §§ 5.1.28, 7.1, Schedule II.) The Loan did not require Lender's advance written consent to retain contractors. (Def.'s 56.1 Stmt. ¶ 105.) Rincon retained Angotti & Reilly ("Angotti") to serve as the Property's general contractor. (Id. ¶ 106.) Angotti retained Interior Design Services LLC ("IDS") as a subcontractor. (Id. ¶ 107.) After Rincon withheld payment because it believed the work was unsatisfactory, Angotti filed a notice and claim of mechanic's lien on December 23, 2008 for $766,420.30. (Def.'s 56.1 Stmt. ¶¶ 110-11.) One day earlier, IDS filed a mechanic's lien totaling $36,400. (Id. ¶ 112; Pl.'s 56.1 Stmt. ¶

12

65.) Additionally, Bacon Plumbing recorded a $62,314.20 mechanic's lien against the Property on December 24, 2008; it partially released its claim on February 4, 2009. (Pl.'s 56.1 Stmt. ¶ 64; Def.'s Resp. to Pl.'s 56.1 Stmt. ¶ 64.) In 2009 Allsite Construction Co. ("Allsite") filed two mechanic's liens totaling $36,400.00 for work completed by VCS Inc. ("VCS").[9]

In 2010, Angotti sued Rincon, and the matter went into arbitration.  (Def.'s 56.1 Stmt. ¶ 123.) On March 29, 2010, the arbitrator awarded Angotti $1,578,856.94 against Rincon, which included arbitration fees, attorneys' fees, and interest; the arbitration award was confirmed by state court.  (Id. ¶ 124.) Angotti then recorded a judgment lien in that amount.  (Pl.'s 56.1 Stmt. ¶ 62.)

Additionally, the Property had an REOA lien imposed upon it. Rincon was a party to the Project's REOA, and the Loan did not require Lender's advance written consent before incurring REOA association fees.  (Id. ¶¶ 133-34.) The REOA reserved the power to file liens in connection with disputed assessments for joint management costs.  (Id.; Def.'s 56.1 Stmt. ¶ 132.) On December 23, 2008, Beacon recorded a lien for $688,845.98 because Rincon was past due on its REOA fees, having been delinquent from June through November 2008.  (Pl.'s 56.1 Stmt. ¶¶ 48-49.) Rincon and Beacon entered into negotiations regarding their dispute over the REOA's

---

[9] Defendant claims that it paid VCS and that the Allsite lien was a result of a dispute between Allsite's former business partners, one of whom formed VCS.  (Def.'s 56.1 Stmt. ¶¶ 120-22; Furka Decl. Exs. 109-10; 2d Suppl. Furka Decl. Ex. 16.)

joint management costs, and Rincon made payment on the lien by
January 23, 2009.  (Def.'s 56.1 Stmt. ¶ 140; Pl.'s Resp. to Def.'s
56.1 Stmt. ¶ 140; Suppl. Furka Decl. Ex. 21.) However, Beacon filed
an additional REOA lien on May 12, 2009, and on September 25, 2009,
Beacon amended it, reducing the amount claimed to $404,829.15.
(Def.'s 56.1 Stmt. ¶¶ 144-46.)

    C.    **CP III Seeking Recovery Under the Guaranty and Through
        Foreclosure**

    Plaintiff won the bid to purchase the Loan in February 2010 and
acquired the Loan on April 16, 2010.  In a letter dated April 15,
2010, Bank of America, as servicer for Maiden Lane and after
Plaintiff's approval, demanded payment of the Loan's outstanding
principal and interest.[10]  (Peluso Decl. Ex. 31; Def.'s 56.1 Stmt.
¶¶ 179-80.) That letter also asserted that an impermissible Transfer
occurred due to the REOA, IDS, and Allsite liens. (Peluso Decl. Ex.
31.) After acquiring the Loan, in a letter dated May 21, 2010, CP
III claimed Cohen was liable as Guarantor for the full principal of
the Loan because Rincon had incurred "unpermitted Indebtedness and
Liens." (Furka Decl. Ex. 143.)  CP III demanded that Cohen pay the
entire outstanding principal balance of $110 million, plus interest
at the Default Rate, within five business days.  (Id.) On June 14,
2010, CP III sent another letter to Cohen, reiterating its demand.

---

    [10] Despite Lender's assertion of Rincon's default in June
2009, Lender did not demand payment of the default or matured
principal, did not initiate foreclosure proceedings, and continued
to accept interest due.   (Def.'s 56.1 Stmt. ¶ 76; Pl.'s Resp. to
Def.'s 56.1 Stmt. ¶ 76.)

(Pl.'s 56.1 Stmt. ¶ 77.)

Neither Rincon nor Cohen made any payment of the Loan's principal.  (Id. ¶¶ 68, 78.) On June 15, 2010, Plaintiff filed a Notice of Default, claiming Borrower owed it approximately $110 million.  (Def.'s Resp. to Pl.'s 56.1 Stmt. ¶ 161.) As a trustee for CP III, on September 22, 2010, Fidelity recorded a Notice of Trustee's Sale.  (Def.'s 56.1 Stmt. ¶ 188.) The Property's non-judicial foreclosure sale took place on October 12, 2010.  (Id. ¶ 197.) CP III was the only bidder, and it purchased the Property with a credit bid price of approximately $73 million.  (Id. ¶ 198.)

D.   The Instant Suit

CP III commenced this action on June 14, 2010, seeking to recover at least $110 million from Cohen based on the Guaranty.[11] Because the Property became encumbered by the REOA lien, several mechanic's liens, and one judgment lien (the "Disputed Liens") without Lender's prior written consent, Plaintiff claims Cohen is

_____

[11] On February 16, 2010, Rincon filed a lawsuit in California Superior Court.  Rincon EV Realty, LLC v. CP III Rincon Towers, Inc., No. CGC 10-496887, Cal. Super. Ct. San Francisco Cnty. (the "California Action").  Alleging that Maiden Lane engaged in wrongful conduct, Rincon sought a declaratory judgment that Maiden Lane waived its security interest in the Loan and that Rincon held title to the Property, free of any claim by Lender.  (Peluso Decl. Ex. 30, at 5, 7.) Cohen was not a named party in the California Action. Rincon later sought a preliminary injunction against the foreclosure, which was denied on July 7, 2010; its appeal was also denied. (Pl.'s 56.1 Stmt. ¶ 75.) Rincon added CP III and its affiliated entities as defendants on September 3, 2010.  (Def.'s Resp. to Pl.'s 56.1 Stmt. ¶ 164.) A bench trial began on July 9, 2012, and the court issued a Statement of Decision on April 2, 2013, entering Judgment in favor of all defendants for all claims. Rincon has appealed that Judgment, which is pending.

personally liable for the Loan's outstanding amount.  Plaintiff
asserts the Disputed Liens triggered three full recourse provisions
of the Guaranty: the voluntary Lien, Transfer, and Indebtedness
Provisions.

II.    DISCUSSION

　　A.    Legal Standard for a Motion for Summary Judgment

　　A district court should grant summary judgment when there is
"no genuine dispute as to any material fact," and the moving party
is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a);
Allianz Ins. Co. v. Lerner, 416 F.3d 109, 113 (2d Cir. 2008).
Summary judgment is appropriate only when, after drawing all
reasonable inferences in favor of a non-movant, no reasonable trier
of fact could find in favor of that party.  Melendez v. Mitchell,
394 F. App'x 739, 740 (2d Cir. 2010).

　　In assessing when summary judgment should be granted, "[t]he
mere existence of a scintilla of evidence in support of the
[non-movant's] position will be insufficient; there must be evidence
on which the jury could reasonably find for the plaintiff."
Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005)
(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).
The non-movant may not rely upon speculation or conjecture to
overcome a motion for summary judgment.  Burgess v. Fairport Cent.
Sch. Dist., 371 F. App'x 140, 141 (2d Cir. 2010).  Instead, when the
moving party has documented particular facts in the record, "the
opposing party must come forward with specific evidence
demonstrating the existence of a genuine dispute of material fact."

16

<u>FDIC v. Great Am. Ins. Co.</u>, 607 F.3d 288, 292 (2d Cir. 2010) (citing <u>Anderson</u>, 477 U.S. at 249).  Thus, unsubstantiated allegations in the pleadings and conclusory allegations cannot create a material issue of fact.  <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000); <u>Melendez</u>, 394 F. App'x at 740.

A court faced with cross-motions for summary judgment need not "grant judgment as a matter of law for one side or the other," but "'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'"  <u>Heublein, Inc. v. United States</u>, 996 F.2d 1455, 1461 (2d Cir. 1993) (citation omitted); <u>Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.</u>, 595 F.3d 458, 468 (2d Cir. 2010).

In a contract dispute, summary judgment generally may be granted "only when the contractual language . . . is found to be wholly unambiguous and to convey a definite meaning." <u>Topps Co., Inc. v. Dadbury Stani S.A.I.C.</u>, 526 F.3d 63, 68 (2d Cir. 2008).  If the contractual provision is ambiguous, "summary judgment may be granted only if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case."  <u>Id.</u>; <u>Compagnie Financiere de CIC et de L'Union Europeene v. Merrill Lynch, Pierce, Fenner & Smith Inc.</u>, 232 F.3d 153, 155 (2d Cir. 2000) (granting summary judgment "because the overwhelming weight of the extrinsic evidence" and a term's ordinary language supported only one reading of an ambiguous provision).

17

B.     The Voluntary Lien Provision Was Not Triggered

In its Complaint, Plaintiff contends the REOA, mechanic's, and judgment liens triggered Cohen's full recourse liability because "Borrower fail[ed] to obtain Lender's prior written consent to any . . . voluntary Lien encumbering the Property (to the extent such consent is required under the Loan Agreement)."  Guaranty ¶ 1.2(b)(iv).  While the Loan defines Lien, none of the Loan Documents define "voluntary" or "voluntary Lien."  Defendant contends that the Disputed Liens are not voluntary Liens and thereby cannot subject him to full recourse liability.

In attempting to avoid Summary Judgment on the voluntary Lien Provision, Plaintiff attempts to create issues of material fact where there are none.  First, without citing to any case law to support its assertion, Plaintiff contends that whether a lien is voluntary is a question of the Borrower's state of mind.  This argument lacks merit.  Plaintiff also claims there is a dispute as to whether Borrower voluntarily incurred the liens because, despite having the funds to make certain payments and despite being warned that the failure to pay would result in liens being filed, Borrower chose not to make timely payments.  Plaintiff cites to no case law to support this specious interpretation.

The Supreme Court has contrasted voluntary and involuntary claims in the bankruptcy context, explaining that "there are two types of secured claims (1) voluntary (or consensual) secured claims, each created by agreement between the debtor and the creditor . . . and (2) involuntary secured claims, such as a judicial or statutory lien . . . , which are fixed by operation of

18

law and do not require the consent of the debtor." <u>United States v.</u>
<u>Ron Pair Enters., Inc.</u>, 489 U.S. 235, 240 (1989); <u>see</u> <u>Black's Law</u>
<u>Dictionary</u> (9th ed. 2009) (defining voluntary lien as "[a] lien
created with the debtor's consent").  Mechanic's liens are a type of
statutory lien, which are liens "arising solely by force of statute,
not by agreement of the parties." <u>Black's Law Dictionary</u> (9th ed.
2009).  Judgment liens, as well as the REOA liens, were also
"imposed on" the Property, and they thereby are not voluntary.  <u>See</u>
<u>id.</u>  Here, based on their plain meaning, the Disputed Liens are
inherently involuntary and do not trigger the voluntary Lien
Provision.  Defendant's Motion for Summary Judgment is GRANTED with
respect to the voluntary Lien Provision, and Plaintiff's claim that
the Disputed Liens triggered Defendant's voluntary Lien full
recourse liability is dismissed.


    C.   The Transfer Provision Was Not Triggered

    Plaintiff asserts that the Disputed Liens triggered Cohen's
full recourse obligations under the Transfer Provision.  "Transfers"
include, <u>inter alia</u>, acts that "mortgage, . . . encumber, pledge,
[or] assign," interests in the Property.  Loan § 5.2.10(b).
Plaintiff claims, since the REOA, mechanic's, and judgment liens are
encumbrances, the Transfer Provision was triggered.  Defendant,
however, asserts that the definition of Transfer is ambiguous and
parol evidence is thereby admissible to demonstrate that Cohen,
Rincon, and Bear Stearns did not intend for the Disputed Liens to
trigger for full recourse liability under the Transfer Provision.

1.   "Transfer" is Ambiguous Under the Guaranty

a.   Legal Standards for Ambiguity

Parties agree that the Guaranty is governed by New York law, see Guaranty ¶ 5.3, and New York law therefore shall be applied. See LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205 n. 7 (2d Cir. 2005) ("'New York law gives full effect to parties' choice-of-law provisions.'" (citation omitted)).  Under New York law, "the best evidence of what parties to a written agreement indend is what they say in their writing.  Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."  Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569 (2002) (citations and quotations omitted).  "The question of whether the language of a contract is clear or ambiguous is a question of law to be decided by the court."  Compagnie Financiere, 232 F.3d at 158 (2d Cir. 2000).  "If the court determines the operative contract to be ambiguous, it may evaluate the extrinsic evidence as a matter of law."  Bank of N.Y. Trust Co., N.A. v. Franklin Advisers, Inc., 726 F.3d 269, 275 (2d Cir. 2013).

Under New York law, "[a]mbiguity is determined by looking within the four corners of the document, not to outside sources."  JA Apparel Corp. v. Abboud, 568 F.3d 390, 396 (2d Cir. 2009) (citation omitted).  "Contract language is not ambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'"  Id. (citation omitted).  If the terms are "susceptible to more than one reasonable interpretation," a contract is

20

ambiguous.  Evans v. Famous Music Corp., 1 N.Y.3d 452, 458 (2004).
The language "is 'capable of more than one meaning when viewed
objectively by a reasonably intelligent person who has examined the
context of the entire integrated agreement and who is cognizant of
the customs, practices, usages and terminology as generally
understood in the particular trade or business.'"  Revson v. Cinque
& Cinque, P.C., 221 F.3d 59, 66 (2d Cir. 2000) (citation omitted).

     The Second Circuit has explained that, under New York law,
"words and phrases should be given their plain meaning, and the
contract should be construed so as to give full meaning and effect
to all of its provisions."  LaSalle, 424 F.3d at 206 (citations and
quotations omitted).  Therefore,

> an interpretation of a contract that has the effect of
> rendering at least one clause superfluous or
> meaningless . . . is not preferred and will be avoided
> if possible.  Rather, an interpretation that gives a
> reasonable and effective meaning to all terms of a
> contract is generally preferred to one that leaves a
> part unreasonable or of no effect.

Galli v. Metz, 973 F.2d 145, 149 (2d Cir. 1992) (citations and
quotations omitted); LaSalle, 424 F.3d at 206; Columbus Park Corp.
v. Dep't of Hous. Pres. & Dev., 80 N.Y.2d 19, 31 (1992) ("[A]
construction which makes a contract provision meaningless is
contrary to basic principles of contract interpretation.").
Accordingly, when interpreting a contract, a court "must consider
the entire contract and choose the interpretation of [the disputed
provision] which best accords with the sense of the remainder of the
contract."  Galli, 973 F.2d at 149 (citation and quotation omitted).

     When reviewing competing interpretations of contractual

language, courts "need not determine which is the more likely
interpretation," but instead "merely decide whether [each] . . . is
sufficiently reasonable to render the clause ambiguous." <u>Mellon
Bank, N.A. v. United Bank Corp.</u>, 31 F.3d 113, 115 (2d Cir. 1994)
(citation omitted).  Although contract terms may be interpreted
against the drafter, "New York applies this rule 'only as a matter
of last resort after all aids to construction have been employed
without a satisfactory result.'" <u>Albany Sav. Bank, FSB v. Halpin</u>,
117 F.3d 669, 674 (2d Cir. 1997).  Additionally, as is the case in
the instant action, where the contract "involv[es] bargained-for
contracts, negotiated by sophisticated parties, the . . . rationale
for [this] doctrine is inapposite." <u>Schering Corp. v. Home Ins.
Co.</u>, 712 F.2d 4, 10 (2d Cir. 1983).


           b.   Analysis
     Under the plain language of the Loan and Guaranty, any Lien
would trigger the Guaranty's Transfer Provision.  "Lien" is defined
as, <u>inter alia</u>, "any mortgage, deed of trust, lien . . . , or any
other encumbrance . . . on or affecting . . . the Property . . . ,
including, without limitation . . . [any] mechanic's, materialmen's
and other similar liens."  Loan § 1.1.  The Loan Agreement provides
that a Transfer will occur should Borrower, <u>inter alia</u>, "encumber,
pledge, assign, grant options with respect to, or otherwise transfer
or dispose of (directly or indirectly, voluntarily or involuntarily,
by operation of law or otherwise, and whether or not for
consideration or of record) the Property."  Loan § 5.2.10(b).
Because an encumbrance is "[a] claim or liability that is attached

22

to property or some other right and that may lessen its value, such as a lien or mortgage," Black's Law Dictionary (9th ed. 2009), under the Disputed Liens' plain meaning, they are Transfers.

Defendant, however, asserts that the Transfer Provision is ambiguous because it is capable of multiple meanings, is inconsistent with other Guaranty provisions, and would produce an absurd result. Because of this ambiguity, Defendant contends that extrinsic evidence should be admissible to demonstrate that Cohen, Rincon, and Lender did not intend to include the Disputed Liens as a trigger for full recourse liability.

One reason for the Transfer being ambiguous, Defendant asserts, is that its definition provides that "Borrower shall not . . . (collectively, a 'Transfer'): (i) sell, convey, mortgage, grant, bargain, encumber, pledge, assign." Loan § 5.2.10(b).  Defendant claims "shall not" means that, to constitute a Transfer, Borrower must take an affirmative action to cause an encumbrance.  Defendant cites to no case law that considers such an argument, nor can the Court find any.  Additionally, this argument fails to account for the Transfer definition's parenthetical language, which modifies all the verbs in the definition's clause, thereby making explicit that a Transfer may be the result of a "voluntary or involuntary" act. Moreover, the Loan is replete with "shall" being combined with passive actions.  See, e.g., Loan § 5.1.4 ("Borrower shall permit agents . . . to inspect the Property."); Loan § 5.2.10(g) ("Lender's consent shall not be required.").  A Transfer plainly can occur absent Rincon's affirmative act.

Defendant next asserts that reading Transfer to include

23

mechanic's liens as triggering full recourse liability would make
other provisions of the Loan and Guaranty meaningless and redundant.
If the definition of Transfer includes mechanic's liens as a full
recourse trigger, Defendant asserts that the Transfer definition
inherently would render the SPE and voluntary Lien Provisions
superfluous.  The SPE Provision would be meaningless, Defendant
contends, because violating the Loan's SPE covenant——which among
forty-four requirements also prohibits certain Liens——triggers only
loss recourse under the SPE Provision.  <u>See</u> Loan § 1.1, at 20-25;
Guaranty ¶ 1.2(a).

　　　Reading Transfer to include mechanic's liens would not render
the SPE Provision superfluous.  The Guaranty's SPE Provision for
loss recourse is triggered if Rincon fails "to maintain its status
as a Single Purpose Entity in accordance with, the terms and
provisions of the Loan Agreement or the Deed of Trust."  Guaranty ¶
1.2(a)(vi).  The SPE covenant mandates, <u>inter alia</u>, that Rincon pays
taxes, uses separate stationary and checks bearing its name,
maintains its own records, and provides Lender with complete
financial statements.  Loan § 1.1, SPE (xv), (xxvii), (xlii), (xlv).
The SPE covenant also states that Rincon must not have any
"judgments or Liens of any nature against it except for tax liens
not yet due and the Permitted Encumbrances."  <u>Id.</u> SPE (xliv). Of the
forty-four SPE covenant requirements, only three reference Liens or
Indebtedness.  Thus, the Loan and Guaranty provide for a baseline of
loss recourse recovery for any SPE covenant violation.  The specific
references to Liens and Indebtedness in the full recourse provisions
thereby control over the general SPE Provision for loss recourse.

See Aramony v. United Way of Am., 254 F.3d 403, 413-14 (2d Cir. 2001) ("Even where there is no 'true conflict' between two provisions, 'specific words will limit the meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which the specific words or clause relate.'" (citations omitted)); see also Bd. of Educ., Yonkers City Sch. Dist. v. CNA Ins. Co., 839 F.2d 14, 18 (2d Cir. 1988) ("Normally, where broad and specific language conflict, the specific language would control."); ING Real Estate Fin. (USA) LLC v. Park Ave. Hotel Acquisition LLC, 907 N.Y.S.2d 437 (NY. Sup. Ct. 2010) (finding that nearly twenty SPE covenants, most of which did not relate to "Indebtedness," were covered by one section of the contract but the Indebtedness SPE covenants were covered by a separate section that "provides specific direction as to how Indebtedness should be treated").  Accordingly, the "no judgments or Liens" SPE covenant requirement does not create ambiguity in the definition of Transfer nor render the SPE Provision meaningless.

However, reading all Liens to be Transfers would render the voluntary Lien Provision meaningless.  Both Guaranty Paragraphs 1.2(b)(iv) and (v) trigger full recourse "if Borrower fails to obtain Lenders prior written consent" to any voluntary Lien or Transfer.[12]  If all Liens are Transfers, then the voluntary Lien Provision is superfluous because <u>all</u> liens would trigger full recourse.  <u>See</u> <u>Garza v. Marine Transp. Lines, Inc.</u> 861 F.2d 23, 27

---

[12] As will be discussed, <u>infra</u> Part II.E., the voluntary Lien and Indebtedness Provisions are only triggered if the Loan required written consent and Borrower failed to obtain it.

(2d Cir. 1998) (finding a contract ambiguous because the interpretation "would have the effect of rendering at least one clause superfluous or meaningless"); Orfalea v. Clayton, Dubilier & Rice, Inc., No. 07 Civ. 2246, 2009 WL 3149453, at *4 (S.D.N.Y. Sept. 30, 2009) (adopting the plaintiff's interpretation because it was in accord with the contract's plain meaning and rejecting the defendant's interpretation because it would render a sentence superfluous); N. Am. Foreign Trading Corp. v. Mitsui Sumitomo Ins. USA, Inc., 413 F. Supp. 2d 295, 303 (S.D.N.Y. 2006) ("Although this interpretation has some literal appeal, it must be rejected because it would render paragraph 7(b) mere surplusage.").

Neither Party's proposed interpretation harmonizes all of the Guaranty and Loan's terms.  See India.com, Inc. v. Dalai, 412 F.3d 315, 323 (2d Cir. 2005) ("Effect and meaning must be given to every term of the contract, and reasonable effort must be made to harmonize all of its terms."); Galli, 973 F.2d at 149 (adopting a party's interpretation because it "best accords with the remainder of the contract because it does not make [certain] paragraphs . . . superfluous").  While Defendant's interpretation that encumber only refers to voluntary Liens would give meaning to the voluntary Lien Provision, his interpretation leaves contractual language ambiguous——and possibly meaningless——because Lien and Transfer thereby would have competing definitions of "encumber" and "encumbrance."  Although Plaintiff's interpretations of Transfer and the Transfer Provision are supported by the plain meaning of encumber, it renders superfluous the voluntary Lien limitation.

Accordingly, the Transfer Provision is ambiguous, and it

thereby "is necessary to look beyond the writings to determine if
the parties intended their contract to have a meaning that renders
at least one clause surplusage." Garza, 861 F.2d 23, 27 (2d Cir.
1998); Inter'l Multifoods Corp. v. Commercial Union Ins. Co., 309
F.3d 76, 87 (2d Cir. 2002) (holding "[g]iven the competing
inferences that can be drawn from the language," the clause was
ambiguous and remanding "for determination of the intent of the
parties with respect to the meaning of" the clause); Seiden Assocs.,
Inc. v. ANC Holdings, Inc., 959 F.2d 425, 429 (2d Cir. 1992)
(holding "an opportunity to present extrinsic evidence must be
afforded" because "the interrelationship of the two provisions . . .
is susceptible to several reasonable interpretations"); Bear,
Stearns Funding, Inc. v. Interface Group-Nevada, Inc., No. 03 Civ.
8259, 2007 WL 1988150, at *12 (S.D.N.Y. July 10, 2007).


           2.   Analysis of the External Evidence

     Parties each contend that negotiations and extrinsic evidence
demonstrate their purported definitions of Transfer.

     At the onset of negotiations, Cohen explained that he would not
sign anything but a bad-boy guaranty.  Defendant's articulation of
his desired contract at the onset of negotiations, however, does not
demonstrate that the Guaranty was limited to such bad-boy acts.
This is especially true given the Indebtedness Provision, which
neither Party disputes may be triggered by actions that do not fall
within the general meaning of bad-boy acts.  Likewise, the May 21,
2007 non-binding and initial draft term sheet noting that the
Guaranty would be non-recourse except for Bear Stearns' standard

                              27

carveouts, which typically only included bad boy acts, is not dispositive.  (Furka Decl. Ex. 34, Milde Dep. 86-87.) Cohen's statement and the May 21st term sheet indicate where negotiations began and do not demonstrate a final agreement.

However, the circulation and negotiation of the May 22, 2007 drafts of the Loan and Guaranty demonstrate that Bear Stearns, Rincon, and Cohen agreed that the mechanic's and REOA liens would not trigger Cohen's full recourse liability.  The Guaranty's first draft provided a loss recourse——and not a full recourse——event would occur for the "failure to pay charges for labor or materials or other charges that can create Liens."  (Furka Decl. Ex. 52.) Black, who represented Rincon and Cohen, proposed striking that provision, as well as moving the Indebtedness, Transfer, and SPE Provisions from the full recourse paragraph to the loss recourse paragraph.  On May 31, 2007, Bear Stearns accepted the proposal to strike the loss recourse provision and move the SPE Provision.  Accordingly, Bear Stearns, Rincon, and Cohen agreed that simply having certain Liens, namely the REOA, mechanic's, and judgment liens in question, would not inherently trigger any liabilities under the Guaranty.

Although Plaintiff attempts to minimize Lender's May 31st concession by pointing to subsequent negotiations of the full recourse terms, Plaintiff's arguments do not change the fact that Rincon, Cohen, and Bear Stearns agreed that certain Liens——namely, the Disputed Liens——would not trigger Cohen's loss recourse obligations.  Plaintiff points to Black's multiple requests, and Bear Stearns' subsequent refusals, to have Indebtedness, voluntary Liens, Transfers become full recourse events only if they have a

28

material adverse effects.  Plaintiff also points to Black's June 8, 2007 request to limit full recourse Indebtedness to voluntary, material Indebtedness.  While Bear Stearns' did not accept that limitation, an apparent compromise was reached: the $250,000 threshold was added to the Indebtedness Provision.  Contrary to Plaintiff's contention, Bear Stearns' rejection of the voluntary Indebtedness limitation or the material adverse effect to the Indebtedness, voluntary Lien, and Transfer Provisions do not demonstrate the negotiating parties' intent as to whether the Disputed Liens constitute Transfers.  After May 31st, Bear Stearns, Rincon, and Cohen did not discuss limiting Cohen's recourse liability with respect to mechanic's liens, further demonstrating their consensus on that issue.  Indeed, the voluntary Lien limitation as well as the May 31 agreement to strike the "failure to pay charges for labor or materials or other charges that can create Liens" clause from the loss recourse paragraph establishes the involuntary Disputed Liens were not intended be deemed Transfers.

This determination is reinforced by Bear Stearns' common practice in similar negotiations.[13]  Although unable to recall Loan and Guaranty negotiations specifically, counsel for Bear Stearns testified that it was not his practice to remove a recourse trigger

---

[13] While Parties and their experts agree that the general practice in the industry is to limit full recourse provisions to willful, egregious, or other bad-boy conduct, Plaintiff contends that the Loan and Guaranty were not typical because the Property's performance made the Loan a risky investment.  Even if the Property's performance and thereby the Loan's risk were reasons for a more expansive Guaranty, that does not trump the actual Loan negotiations nor explain why the definition of Transfer was broader than industry expectations.

and then add the same concept to another section without discussing the addition with a borrower.  Here, where the parties expressly agreed to remove the "failure to pay charges for labor or materials or other charges that can create Liens" loss recourse trigger and then limited Liens that could trigger full recourse to voluntary Liens, it is axiomatic that they did not intend for the general word "encumber" in the Transfer Provision to override their express negotiations that expressly limited what Liens would trigger Cohen's Guaranty obligations to only voluntary Liens.[14]  See Aramony, 254 F.3d at 414 ("[E]ven if the general language of Article I, considered in isolation, is broad enough to manifest a generalized intent . . . , Article I's broad language is limited by the specific operative language of Article V.").

Such an interpretation also avoids reading the contract in a commercially unreasonable or absurd manner.  Lipper Holdings v. Trident Holdings, 766 N.Y.S.2d 561, 561 (1st Dep't 2003) ("A contract should not be interpreted to produce a result that is absurd . . . [or] commercially unreasonable.").  Under California law, a mechanic's lien may be filed even if an invoice is not yet past due.  Cal. Civ. Code § 8414; see D'Orsaay Int'l Partners v. Superior Court, 123 Cal. App. 4th 836, 842 (2d Dist. 2004).  As the Loan required Rincon to renovate the Property but did not require Lender's prior written consent to securing contractors, any retained

---

[14]  Bolstering this finding is the fact that Lien definition expressly included "mechanic's, materialmen's and other similar liens and encumbrances" whereas the Transfer definition's only mention of liens was via the word "encumber."

30

contractor could file a lien.  If, as Defendant contends, the
Allsite lien was baseless and a result of a dispute between
Allsite's former business partners, the Allsite lien illustrates how
allowing mechanic's liens to trigger full recourse liability under
Plaintiff's expansive definition of Transfer would produce an absurd
result.  Here, where the contract language is ambiguous, such an
interpretation must be avoided.  See Bison Capital Corp. v. ATP Oil
& Gas Corp., No. 10 Civ. 714, 2011 WL 8473007, at *6 (S.D.N.Y. Mar.
8, 2011) (rejecting a party's interpretation because it "would lead
to absurd results"); ING Real Estate Fin., 907 N.Y.S.2d at 437
(holding, after finding that two sections of the contract were
"facially inconsistent," it would be commercially unreasonable for
defendants to be potentially liable for "$145 million if the
Borrower is just one day delinquent in paying a dollar in property
taxes or any other debt for which a lien may be imposed" where the
other section provided a thirty-day notice and cure period).

    Accordingly, after examining the extrinsic evidence, the
overwhelming weight of the evidence demonstrates there is no dispute
of material fact: Bear Stearns, Rincon, and Cohen never intended for
the Disputed Liens to trigger Defendant's full recourse liability
under the Transfer Provision.  This determination also better
harmonizes all Guaranty provisions and avoids absurd results.
Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's
Motion for Summary Judgment is DENIED with respect to the Transfer
Provision.  Plaintiff's claim that the REOA, mechanic's, and
judgment liens triggered Defendant's full recourse liability under
the Transfer Provision is dismissed.

D.   The Indebtedness Provision Was Not Triggered

Plaintiff asserts that the untimely payment of the REOA charges and Angotti balance, as well as the Disputed Liens, triggered Cohen's full recourse obligations under the Indebtedness Provision.

Parties agree that the untimely payments of REOA charges and Angotti balance constitute Indebtedness.  See Loan § 1.1, Indebtedness (a).  Under Indebtedness Provision, Cohen's full recourse liability is triggered "if Borrower fails to obtain Lender's prior written consent to any Indebtedness (provided such Indebtedness exceeds $250,000.00 ) . . . [and] (to the extent such consent is required under the Loan Agreement").  Guaranty ¶ 1.2(b)(iv).  Parties dispute whether written consent was required for the two tardy payments in question.

To avoid the Indebtedness Provision's full recourse trigger, Plaintiff argues that Borrower needed Lender's written consent before allowing the REOA charges and Angotti balance to become past due and before contesting those bills.  This argument is based on the Loan's requirement that Borrower pay the REOA charges and bills for labor and materials "when due."  Deed of Trust § 3.6(a); see Loan § 5.1.24(b).  Defendant, however, contends that the Indebtedness Provision's language, "Lender's prior written consent to any Indebtedness," inherently means the Guaranty only addresses situations in which Lender's prior written consent is required before incurring the Indebtedness, which does not apply here because the Loan does not impose a prior written consent requirement before Borrower incurred REOA charges or employed contractors.  Thus,

32

Parties dispute the timing of "prior written consent."

Plaintiff's strained reading of "prior written consent" fails to take into account the succeeding phrase in the Indebtedness Provision, namely "to any Indebtedness."  As Indebtedness is defined as any indebtedness, any liability, and certain obligations, the Provision is triggered if Borrower failed to obtain Lender's prior written consent, if required, before becoming so indebted.  The Provision does not make any reference to the timely payment of Indebtedness; rather it envisions situations in which the Loan expressly requires prior written consent before incurring certain indebtedness, liability, or obligations.[15]  The Loan and Guaranty do not require Borrower to obtain Lender's consent before incurring REOA fees or securing contractors.  While other Loan provisions require the timely payment of Indebtedness and the avoidance of past-due liabilities, those provisions cannot be read to modify the Indebtedness Provision's clear mandate that Borrower obtains "Lender's <u>prior</u> written consent to any Indebtedness" if such prior consent is "required under the Loan Agreement."[16]  Guaranty ¶

---

[15] While Plaintiff asserts that accepting Defendant's interpretation would mean that no Indebtedness would ever trigger the Guaranty, that is not the case.  <u>See, e.g.,</u> Loan § 5.1.11(e).

[16] Had Bear Stearns, Rincon, and Cohen intended Plaintiff's purported interpretation, they could have added "past-due" language to the Indebtedness Provision, as they did in so many other terms of the Loan and Guaranty.  The Court will not read the Guaranty to include such language.  <u>See</u> <u>Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.</u>, 869 N.Y.S.2d 511, 516 (1st Dep't 2008) ("A court may not, in the guise of interpreting a contract, add or excise terms or distort the meaning of those used to make a new contract for the parties.").

1.2(b)(iv) (emphasis added).  Accordingly, because Borrower was not required to obtain Lender's prior written consent before incurring the REOA and Angotti charges, the Guaranty's Indebtedness Provision was not triggered.

Although Plaintiff claims the Disputed Liens were also Indebtedness, Defendant argues those liens do not qualify as Indebtedness.  The Court need not reach the issue of whether the Disputed Liens are Indebtedness because the Loan does not require prior written consent before Borrower encumbered the Property with the REOA, mechanic's, or judgment liens.  See Loan § 1.1, Liens. Thus, even if they constituted Indebtedness, the same analysis with respect to the two tardy payments holds true for the liens in question: because Borrower did not need Lender's written permission before incurring the Disputed Liens, they cannot give rise to Cohen's liability under the Indebtedness Provision.

Accordingly, Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Summary Judgment is DENIED with respect to the Indebtedness Provision.


III. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Summary Judgment is DENIED. The Clerk is directed to enter judgment in favor of Defendant and to close the docket in the matter.

SO ORDERED.

Dated:    New York, New York

          April 7, 2014

_Deborah A. Batts_
Deborah A. Batts
United States District Judge

34