UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                     :

CP III RINCON TOWERS, LLC,               :

                                :

                    Plaintiff,           :

                                :            10-CV-4638 (JMF)

        -v-                       :

                                :        FINDINGS OF FACT AND

RICHARD D. COHEN,                :        CONCLUSIONS OF LAW

                                :

                  Defendant.       :

                                :
-------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      This long-running case arises from a dispute over a $110 million real estate loan.  In

2007, entities controlled by Defendant Richard D. Cohen secured the loan to purchase a

residential apartment complex in San Francisco, California.  Plaintiff CP III Rincon Towers,

LLC ("CP III") acquired the loan in 2010 and several months later purchased the property itself

via a non-judicial foreclosure sale.  In this case, CP III seeks to enforce a related personal

guaranty signed by Cohen, arguing that he is liable for the outstanding amount of the loan

pursuant to provisions that prohibited "Transfers" and "Indebtedness" without the prior written

consent of the lender.  CP III contends that these provisions were triggered by certain liens

recorded against the property; Cohen contends that the liens did not trigger full recourse liability.

      In 2014, the Honorable Deborah A. Batts, to whom this case was originally assigned,

granted summary judgment in Cohen's favor.  On appeal, the Second Circuit vacated and

remanded, concluding that there were disputes of material fact with respect to the proper

interpretation of both the "Transfer" and "Indebtedness" provisions of the guaranty.  In

December 2021, the Court held a bench trial with direct testimony of those witnesses who

testified in court by affidavit.  For the reasons that follow, the Court concludes that the full

record supports the conclusions that Judge Batts reached, albeit perhaps prematurely, in her 2014 decision: namely, the disputed liens did not trigger Cohen's full recourse liability under the guaranty.  Accordingly, the Court will enter judgement in favor of Cohen.

**FACTUAL FINDINGS**

Many, if not most, of the facts relevant to the resolution of this case are not in dispute. In any event, pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact based on the testimony and exhibits at trial.[1]

**A.  The Loan and Guaranty**

In 2007, Cohen became interested in buying a residential apartment complex located in San Francisco, California (the "Property").  ECF No. 210, § 1.A ("Joint Stip."), ¶¶ 8, 11-12. Cohen's plan was to increase the Property's value by renovating the units and common areas. Cohen Aff. ¶ 4.[2]  To purchase the Property, Cohen established three special purpose entities ("SPEs") — Rincon EV Realty, LLC, Rincon ET Realty LLC, and Rincon Residential Towers LLC — that the Court (following the parties) will refer to collectively as "Rincon."  Joint Stip. ¶ 2.  In connection with the purchase, Rincon borrowed $110 million from Bear Stearns Commercial Mortgage Inc. ("Bear Stearns") pursuant to a loan agreement (the "Loan Agreement").  *Id.* ¶¶ 2, 5; *see* JX1 ("Loan Agmt.").  The loan was secured, in turn, by a guaranty

---

[1]     The Court ruled on some of the parties' objections to testimony and exhibits at trial.  To the extent that the Court cites in this Opinion to any evidence to which a party objected, the objection is overruled.  The Court need not and does not resolve the remaining objections.

[2]     "[Name] Aff." refers to the named witness's affidavit; "[Name] Dep. Tr." refers to the named witness's deposition transcript; JX__ refers to a Joint Exhibit; PX__ refers to a Plaintiff's Exhibit; DX__ refers to a Defendant's Exhibit; and "Tr. __" refers to the transcript of the trial, conducted on December 13 and 16, 2021.  Because the pagination of some exhibits is inconsistent, references to exhibits will include, where appropriate, the terminal digits of the Bates stamp number located at the bottom right of each page.

(the "Guaranty") signed by Cohen personally.  Joint Stip. ¶ 4; *see* JX2 ("Guaranty").  The Guaranty includes two types of recourse provisions: loss recourse provisions, pursuant to which Cohen would be required to cover only the lender's losses, and full recourse provisions, pursuant to which Cohen would be required to pay "the entire amount of the Debt."  Guaranty §§ 1.2(a), (b).

This case turns on two of the Guaranty's full recourse provisions.  First, the "Indebtedness Provision" provides for full recourse "if Borrower fails to obtain Lender's prior written consent to any Indebtedness (provided such Indebtedness exceeds $250,000.00 or if any such Indebtedness is in the form of mezzanine debt or preferred equity) . . . (to the extent such consent is required under the Loan Agreement[)]."  *Id.* § 1.2(b)(iv).  "Indebtedness" is defined (by the Loan Agreement), in turn, as "the sum" of "all indebtedness or liability," including, among other specific categories, "obligations secured by any Liens, whether or not the obligations have been assumed (other than the Permitted Encumbrances and Permitted Equipment Financing)."  Loan Agmt. § 1.1.  Second, the "Transfer Provision" provides for full recourse "if Borrower fails to obtain Lender's prior written consent to any transfer if required by the Loan Agreement or the Deed of Trust."  Guaranty § 1.2(b)(v).  The Loan Agreement defines "Transfer," in turn, as "sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of."  Loan Agmt. § 5.2.10(b).  It defines "Lien" as "any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of" the Property.  *Id.* § 1.1.

Two other provisions of the Guaranty, although not directly at issue, are also relevant here.  First, the Guaranty contains a "Voluntary Lien Provision" granting full recourse liability "if Borrower fails to obtain Lender's prior written consent to any . . . voluntary Lien

encumbering the Property (to the extent such consent is required under the Loan Agreement[)]."
Guaranty § 1.2(b)(iv).  Second, the loss recourse section of the Guaranty provides liability for
"the failure by Borrower to maintain its status as a Single Purpose Entity in accordance with, the
terms and provisions of the Loan Agreement or the Deed of Trust."  *Id.* at § 1.2(a)(vi) ("SPE
Provision").[3]  The Loan Agreement, in turn, provides various requirements for the borrower to
maintain its status as an SPE.  The borrower must, among other things, (1) "remain solvent" and
"pay its debts and liabilities . . . from its assets as the same shall become due," Loan Agmt. § 1.1,
"Special Purpose Entity," (xii), (2) not have more than $1 million in "liabilities incurred in the
ordinary course of business," which must not be past due, *id*., at (xxiii) and (3) not allow liens to
be recorded against the Property that are not "Permitted Encumbrances" *id*., at (xliv).

### B.  The Negotiation and Drafting Process

In May 2007, Cohen and a representative of Bear Stearns first discussed the terms of the
loan.  Joint Stip. ¶¶ 20-22.  Cohen testified that, based on that conversation, he understood that
he "would not be personally responsible as a guarantor for any acts that [he] did not have sole
control over or that were outside the scope of typical . . . 'bad- boy' acts in which the actions
triggering personal liability involve significant improper conduct and are within the borrower's
and/or guarantor's control."  Cohen Aff. ¶ 7.  Following that initial conversation, Bear Stearns
sent Cohen an initial term sheet, which, as to the Guaranty, stated "[n]on-recourse to Borrower
and acceptable Indemnitor with Lender's standard carveouts."  DX1 at 3.  According to the Bear
Stearns representative who discussed the loan with Cohen, Bear Stearns's "standard" carveouts

---

[3]      The loan documents refer to "Special Purpose Entity" and "Single Purpose Entity"
interchangeably.  Joint Stip. ¶ 42.

were "for things that [it] considered bad boy acts," including "fraud, misrepresentation, []misallocation of funds [and] . . . unpermitted indebtedness."  Milde Dep. Tr. 86-87.

Following distribution of the term sheet, counsel for Bear Stearns prepared initial drafts of the loan documents (the "Loan Documents").  Joint Stip. ¶ 16.  As relevant here, the initial draft of the Guaranty included a provision (the "Failure-to-Pay Provision") providing for loss recourse in the event of any "failure to pay charges for labor or materials or other charges that can create Liens on any portion of the Property."  JX7 at 239; Black Aff. ¶ 9.  By contrast, the initial versions of the Indebtedness, Transfer, and SPE Provisions called for full recourse.  JX7 at 240; Black Aff. ¶ 10.  Counsel for Cohen proposed various changes to the initial draft of the Loan Documents.  As relevant here, he requested that the Failure-to-Pay Provision be stricken, that mechanic's liens not be included in the recourse events at all, and that equipment leases be added to the list of permitted liens under the Loan Agreement.  JX8 at 1; JX9; Black Aff. ¶¶ 11-12, 14.  He also asked that the Indebtedness, Transfer, and SPE Provisions be moved from full recourse to loss recourse.  JX8; JX10 at 1006; Black Aff. ¶¶ 17, 19.[4]

Counsel for Bear Stearns then circulated revised drafts of the Loan Documents, which added "Permitted Equipment Financing" to the list of permitted liens in the Loan Agreement and struck the Failure-to-Pay Provision from the Guaranty.  JX11 at 1200, 1230, 1267; Black Aff. ¶¶ 21-23.  The new drafts also changed the SPE Provision from full recourse to loss recourse. JX11 at 267; Black Aff. ¶ 22.  But counsel for Bear Stearns did not adopt the request that the Indebtedness and Transfer Provisions be changed from full recourse to loss recourse.  *Id.*

---

[4]      Cohen's counsel initially made these comments in response to Section 9.3 of the Loan Agreement, which mirrors Section 1.2 of the Guaranty, and later stated that they should also be applied to the Guaranty.  Black Aff. ¶ 19.

Later in the negotiations, counsel for Cohen proposed that the Transfer and Indebtedness Provisions be changed to trigger full recourse only to the extent that they had a "material adverse effect" and to otherwise trigger loss recourse.  Black Aff. ¶ 27; JX12 at 51.  Counsel for Bear Stearns expressed doubt that such a compromise was necessary but stated that they would consider any language proposed by Cohen's counsel.  JX13; Black Aff. ¶ 33.  Thereafter, counsel for Bear Stearns deleted, and then reinserted, the Indebtedness Provision.  JX15 at 3158-59, 266; JX19 at 4511, 4385; Black Aff. ¶¶ 35, 40.  In response to the reinsertion, counsel for Cohen wrote in email: "I'm not sure why the lender made this change, but to the extent it is required by lender, such an occurrence should be limited to actual loss or, if it is to be a full recourse event, it should be limited to 'voluntary, material' Indebtedness."  JX20.  This exchange prompted a telephone call with counsel for both sides.  Joint Stip. ¶ 37; Black Aff. ¶ 42.  Ultimately, the Indebtedness Provision remained full recourse and Cohen's counsel's proposal that it be limited to "voluntary, material" indebtedness was rejected.  Instead, the parties inserted the phrase "provided such Indebtedness exceeds $250,000 or if any such Indebtedness is in the form of mezzanine debt or preferred equity," into the provision and added a second, loss recourse Indebtedness Provision for any indebtedness that did not meet that financial threshold.  JX22 at 4998, 5221; Black Aff. ¶ 44.  Cohen's counsel testified that the $250,000 threshold was proposed by counsel for Bear Stearns during the call between the parties.  Tr. 102.

Once the Loan Documents were finalized, Bear Stearns issued several documents summarizing the terms of the loan.  First, Bear Stearns issued a Commitment Committee Memorandum — used to request final internal approval before a loan is closed — that listed as "Non-Recourse Carveouts" "Fraud, Misrepresentation, Gross Negligence, Willful Misconduct, Removal of Property, Misappropriation, Subordinate Debt, Assignment, Environmental, . . .

[and] Voluntary [Bankruptcy]." JX18 at 26. On the day of the signing, counsel for Bear Stearns circulated a final closing statement that similarly listed the "non-recourse carveouts" as "fraud, misrepresentation, willful misconduct, removal or disposal of property, misapplication or conversion by Borrower, failure to obtain Lender's consent to subordinate debt [subject to the $250,000 requirement], failure to obtain Lender's consent to Assignments, Transfers, etc., Environmental, involuntary bankruptcy, voluntary bankruptcy, [and] if an Individual Borrower seeks or files an action for the Partition of the Property." JX23 at 9007-8. In addition, Bear Stearns required and received from counsel for Rincon an opinion letter, which stated that the lender was not permitted to "invoke penalties (or other remedies) for defaults that bear no reasonable relation to the damage suffered or that would otherwise work a forfeiture." JX25 at 9472.

The loan documents — the Loan Agreement, the Guaranty, a Deed of Trust, JX3, and a Promissory Note, JX4 — were executed on June 8, 2007. Joint Stip. ¶ 41. Rincon then acquired the Property for approximately $153.6 million. *Id.* ¶ 14.

## C. The Liens

After Rincon acquired the Property, several liens were recorded against the Property. Three are relevant to the parties' dispute here.

### 1. The REOA Lien

The land on which the Property sits is subject to an agreement (the "REOA") governing charges for shared services among the separately owned parcels on the land. *Id.* ¶¶ 57, 60. The REOA provides that unpaid charges under the agreement may be unilaterally recorded by the association governing the agreement as a lien against the property. *Id.* ¶ 61. In early 2008, Rincon concluded that the association had misallocated to it certain common expenses under the

REOA and disputed the charges.  *Id.* ¶ 63.  At trial, Cohen testified that he had ultimate decision-making authority regarding whether to pay the charges.  Tr. 43, 46.  On December 23, 2008, a lien of $688,845.98, representing the unpaid charges, was recorded against the Property.  Joint Stip. ¶ 66.

In January 2009, Rincon informed BlackRock Financial Management ("BlackRock"), which was then managing the loan,[5] about the lien.  *Id.* ¶¶ 67-71.  On January 26, 2009, Rincon made a payment of approximately $250,000, and the lien was removed.  *Id.* ¶ 72.  On March 17, 2009, Rincon paid an additional $188,000 but continued to dispute the remaining charges.  *Id.* ¶ 74.  On May 12, 2009, a new lien of $651,905.11 was entered against the Property.  *Id.* ¶ 76. Rincon communicated with BlackRock about the dispute multiple times between January and September 2009, when the lien amount was reduced to $404,829.15.  *Id.* ¶¶ 73, 75, 79, 80-81.  In November 2009, Rincon commenced arbitration proceedings to resolve the disputed lien, although a decision was never issued.  *Id.* ¶ 82.  In January 2010, an internal BlackRock email indicated that BlackRock was aware of the lien, understood it to be subject to arbitration, and took the position at that time that "there [was] no need to bond [the lien] over."  JX81.

Ultimately, when CP III acquired the Property in 2010, it paid approximately $991,000 to resolve the REOA lien.  Joint Stip. ¶ 84; JX58.

### 2.  The Mechanic's Liens and Angotti Judgment Lien

The Loan Agreement required Rincon to undertake certain renovations and improvements.  *See* Loan Agmt. §§ 5.1.28, 7.1.1, Schedule II; Joint Stip. ¶ 85.  In December

---

[5]      In 2008, when Bear Stearns collapsed and was acquired by JP Morgan Chase & Co., the loan (along with other Bear Stearns assets JP Morgan was unwilling to acquire) was acquired by the Maiden Lane Trust, to be managed by BlackRock, pursuant to an agreement facilitated by the Federal Reserve Bank of New York.  Joint Stip. ¶¶ 47-49.

2007, Rincon hired a firm named Angotti & Reilly to serve as general contractor for the required renovations. *Id.* ¶ 87. Angotti retained subcontractors, including Interior Design Service ("IDS"), Bacon Plumbing, and Allsite Construction Company ("Allsite"). *Id.* ¶¶ 88, 97, 106. A dispute arose between Rincon and Angotti, and in December 2008, Angotti, IDS, and Bacon recorded mechanic's liens against the Property for $766,420.30, $142,700.51, and $62,314.20, respectively. *Id.* ¶¶ 96-97. At trial, Cohen once again testified that he had ultimate decision-making authority regarding whether to pay these liens. Tr. 43, 46. In March 2009, Rincon communicated about the liens with BlackRock. Joint Stip. ¶¶ 104-05. In June 2009, two more mechanic's liens, totaling $36,400, were recorded by Allsite. *Id.* ¶ 106.

Rincon and Angotti were unable to resolve their dispute, and Angotti initiated arbitration proceedings in which IDS was also a named party. *Id.* ¶ 112. In January 2010, an internal BlackRock email indicated that BlackRock was aware of the liens, understood them to be subject to arbitration, and took the position at that time that "there [was] no need to bond [the liens] over." JX81. In March 2010, Angotti was awarded $1,578,856.94 in the arbitration, and the award was confirmed by a court in June 2010. Joint Stip. ¶¶ 113-14. Angotti then filed a notice of its judgment lien with the California Secretary of State. *Id.* ¶ 115. Finally, in June and August 2010, releases of the liens recorded by Bacon and Allsite were recorded. *Id.* ¶¶ 107, 111.

**D. Default and Foreclosure**

The Loan Agreement provided that the initial maturity date for the loan would be June 12, 2009, but subject to certain conditions, Rincon could extend the maturity date by one year. *Id.* ¶ 50; Loan Agmt. §§ 1.1, 2.7.

In March 2009, Rincon indicated to Maiden Lane (which, at that point, served as the lender) that it wished to extend the maturity date pursuant to Section 2.7 of the Loan Agreement.

JX28.  On June 24, 2009, Bank of America, acting on behalf of Maiden Lane, sent a letter

informing Rincon that the maturity date could not be extended because the conditions in the

Loan Agreement for an extension had not been met.  JX31.  The letter stated that the Rincon had

"failed to satisfy all of the terms and conditions of . . . Sections 2.7(f) and 2.7(g)" of the Loan

Agreement, *id.* at 82, which required that "the maximum principal amount of the loan . . . not

exceed seventy-two percent . . .  of the fair market value of the Property" and that the borrower

comply with the business plan set forth in the Loan Agreement, Loan Agmt. §§ 2.7(f)-(g).  The

letter further stated that Rincon "ha[d] breached its obligations under the Loan Agreement, the

Note and the other Loan Documents, including, without limitation, due to its failure to pay the

outstanding principal amount of the Loan" and that the lender "reserve[d] the right to pursue any

and all other remedies . . . including . . . any guaranties."  JX31 at 82.

       On December 22, 2009, Bank of America sent Rincon another letter, reiterating that "the

Loan ha[d] matured, the maturity date ha[d] not been extended, the Borrower ha[d] breached its

obligations under the Loan Agreement, the Note and the other Loan Documents, including,

without limitation, the obligation to pay the outstanding principal" in June of 2009.  PX73 at 1.

The letter also noted that Rincon had "communicated verbally to the Lender" that the mechanic's

liens and REOA lien were being "contested" and were "the subject of forthcoming arbitration

proceedings," but that Rincon had not provided written notice that it was contesting these liens.

*Id.* at 2.  In the letter, the lender once again reserved the right to pursue remedies under the Loan

Documents "including, without limitation, any guaranties."  *Id.* at 2-3.  On February 16, 2010,

Rincon filed a lawsuit in California state court, seeking, among other things, to enjoin the lender

from foreclosing on the Property.  DX33.

In early 2010, Maiden Lane began speaking to potential buyers of the loan. Carmel Partners, the owner of CP III, was interested in acquiring the loan and prepared an internal document titled "Investment Package – Note Purchase," which contained an analysis of the loan as an investment opportunity. JX32. Most relevant here, it noted that the loan was "non-recourse with the exception of 'Bad Acts' including fraud, misapplication of funds, obtaining subordinate financing, filing for voluntary bankruptcy, and environmental, etc." *Id.* at 45764.

On April 9, 2010, Carmel Partners signed an agreement with Maiden Lane to purchase the loan for $83 million. Joint Stip. ¶ 118; JX82. Six days later, Bank of America formally advised Rincon by letter that it was in default. Joint Stip. ¶ 119; JX83. In the same letter, Bank of America stated — for the first time — that there had been a "Transfer of the Property in breach of Section 5.2.10 of the Loan Agreement" as a result of the mechanic's liens and REOA lien recorded against the Property. JX83 at 5339. Additionally, the letter referred — also for the first time — to a breach of the Guaranty, "remind[ing]" Rincon that, "pursuant to Section 1.2(b)(v) of the Guaranty Agreement executed at closing, the Guarantor is liable for repayment of the entire amount of the Debt if the Borrower fails to obtain the Lender's prior written consent to any Transfer for which consent is required under the Loan Agreement or the Mortgage." *Id.* at 5340. Carmel Partners reviewed and provided input on the April 15th letter before it was sent. *See* DX34.

The following day, April 16, 2010, Carmel Partners, through CP III,[6] acquired the loan from Maiden Lane. Joint Stip. ¶¶ 2, 120; JX84. Shortly thereafter, CP III demanded payment

---

[6]      CP III Rincon Towers, Inc. was formed by Carmel Partners in 2010 to acquire the loan. Joint Stip ¶ 1. In 2018, CP III Rincon Towers, Inc., was converted into CP III Rincon Towers, LLC, which was substituted as the plaintiff in this proceeding. *Id.*; *see* ECF No. 135. For ease of reference, the Court refers to these entities interchangeably as CP III.

from Cohen under the Guaranty, stating that Cohen's obligations "ha[d] been triggered by Borrower's accumulation of Indebtedness to Rincon Center Commercial LLC in an amount exceeding $250,000, and the resultant Lien recorded against the Property, as well as by other unpermitted Indebtedness and Liens." JX85; Joint Stip. ¶ 121. On June 14, 2010, CP III commenced this action seeking to enforce the Guaranty. ECF No. 1 ("Compl."). Approximately four months later, CP III initiated a non-judicial foreclosure sale of the Property. Joint Stip. ¶ 125. Although CP III was willing to bid up to $108 million to acquire the Property at that time, *see* JX87 at 39511, it ultimately acquired the property for only $73 million, Joint Stip. ¶ 125; JX88.

### E. The California Action

Following its acquisition of the loan, CP III was substituted for Maiden Lane as the defendant in the California lawsuit brought by Rincon. Joint Stip. ¶ 127. As relevant here, in March 2013, the trial court entered a statement of decision following a bench trial, which granted judgment for CP III on all claims and concluded, among other things, that Rincon had defaulted on the loan as of June 12, 2009 (i.e., the original maturity date). *See Rincon EV Realty LLC v. CP III Rincon Towers, Inc.*, No. CGC-10-496887, 2013 WL 2948068, *5 (Cal. Super. Mar. 25, 2013); *see also* Joint Stip. ¶ 56. An appellate court affirmed the trial court's decision as to Rincon's equitable claims but held that Rincon's demand for a jury trial should not have been stricken as to its legal claims. *See Rincon EV Realty LLC v. CP III Rincon Towers, Inc.*, 213 Cal. Rptr. 3d 410, 424-25 (2017). On remand, the trial court granted summary judgment on those claims to CP III. *See Rincon EV Realty LLC v. CP III Rincon Towers, Inc.*, No. CGC-10-496887, 2017 WL 11507539 (Cal. Super. Sept. 18, 2017). These decisions are now final. Joint Stip. ¶¶ 129-30. Additionally, after granting summary judgment, the California court awarded

CP III $9.2 million in fees, *Rincon EV Realty LLC v. CP III Rincon Towers, Inc.*, No. CGC-10-496887, 2021 WL 2374772 (Cal Ct. App. June 10, 2021), and eventually deemed Cohen to be a judgment debtor as an alter ego of Rincon, PX94.  The parties continue to litigate the fee award in California.  Joint Stip. ¶¶ 132-34.

## F.  Procedural History

In its Complaint here, CP III alleged that the REOA lien, mechanic's liens, and Angotti judgment lien triggered three full recourse provisions of the Guaranty — the Voluntary Lien, Indebtedness, and Transfer Provisions — and, thus, that Cohen was liable for the full amount of the outstanding debt and interest.  *See* Compl. ¶¶ 34-45.

Following cross-motions for summary judgment, Judge Batts granted summary judgment on all claims to Cohen, concluding that none of the Guaranty's full recourse provisions were triggered by the liens.  *See CP III Rincon Towers, Inc. v. Cohen*, 13 F. Supp. 3d 307 (S.D.N.Y. 2014) (hereafter, "*Rincon I*") (ECF No. 103).  To the extent relevant here, Judge Batts held first that none of the liens were voluntary, so the Voluntary Lien Provision had not been triggered. *Id.* at 317-18.  Second, she held that the Transfer Provision was ambiguous because the definition of "Transfer" would encompass *any* lien, whether voluntary or involuntary, thereby rendering the Voluntary Lien Provision meaningless.  *Id.* at 319-21.  Examining evidence of the parties' negotiation of the Guaranty, Judge Batts concluded that "the overwhelming weight of the evidence demonstrates that" the parties "never intended for [the liens at issue] to trigger [Cohen's] full recourse liability under the Transfer Provision."  *Id.* at 324.  In particular, she placed heavy emphasis on the removal of the Failure-to-Pay Provision, which would have triggered loss recourse; it is unlikely, she reasoned, that the parties intended for there to be *full* recourse liability for the same thing via a different provision.  *Id.* at 322.  Finally, Judge Batts

held that the Indebtedness Provision applied only to indebtedness for which the borrower was required, and failed to, obtain the lender's advance written consent under the Loan Agreement. *Id.* at 324-25.  She concluded that was not the case for any of the liens at issue.  *Id.*

CP III appealed, challenging only Judge Batts's rulings with respect to the Transfer and Indebtedness Provisions.[7]  By summary order dated November 29, 2016, the Second Circuit vacated and remanded.  *See CP III Rincon Towers, Inc. v. Cohen*, 666 F. App'x 46 (2d Cir. 2016) (ECF No. 108) (hereafter, "*Rincon II*").  The Court agreed with Judge Batts that "the tension between" the Voluntary Lien Provision and the Transfer Provision, "and between the opposing principles of contract interpretation which would support giving effect to one clause or the other," rendered the Guaranty ambiguous.  *Id.* at 52.  Nevertheless, the Court held that Judge Batts had erred in relying on extrinsic evidence to resolve a motion for summary judgment, concluding that the evidence was not "so one-sided that no reasonable factfinder could read the contract differently" and, thus, that "determination of the parties' intent" should have been left "to the ultimate factfinder."  *Id.* at 52 (internal quotation marks omitted).  The Court also vacated Judge Batts's decision as to the Indebtedness Provision, concluding that she had failed to "fully consider the interaction between" the Indebtedness Provision and the SPE provisions of the Loan Agreement, which "require[d] Borrower to secure consent from the Lender prior to taking any action affecting Borrower's special purpose entity status," such as taking on more than $1 million in debt in the ordinary course of business, having debt that was past due, or allowing judgments or liens to be recorded against the Property.  *Id.* at 54-55.  Judge Batts, the Court explained, "did not . . . consider whether, and under what circumstances," the failure to obtain

---

[7]     Accordingly, Judge Batts's holding that the liens did not trigger the Voluntary Lien Clause is now final.  *See also* ECF No. 165-1 ("Joint Statement"), § I.A.1 (agreeing that this issue is no longer in dispute).

consent under the SPE provisions "might trigger full recourse to Cohen . . . as Indebtedness for which the Lender's prior written consent is required under the Loan Agreement." *Id.* The Court remanded for consideration of these issues.

Following remand, the case was reassigned to the undersigned and, in December 2021, the Court held a bench trial with direct testimony taken from several witnesses by affidavit.

## CONCLUSIONS OF LAW

### A. Applicable Legal Principles

To establish a breach of contract under New York law, which governs the Guaranty, a plaintiff must show "(1) the existence of an agreement, (2) adequate performance of the contract by the claimant, (3) breach of contract by the accused, and (4) damages." *Stadt v. Fox News Network LLC*, 719 F. Supp. 2d 312, 318 (S.D.N.Y. 2010) (internal quotation marks and alterations omitted). A written contract must be interpreted according to the parties' intent, which is "derived from the plain meaning of the language employed in the agreements." *In re Lehman Bros. Inc.*, No. 11-CV-6053 (KBF), 478 B.R. 570, 586 (S.D.N.Y. 2012), *aff'd sub nom. In re Lehman Bros. Holdings Inc.*, 761 F.3d 303 (2d Cir. 2014) (internal quotation marks omitted). In a dispute over the meaning of a contract, the threshold question is whether the contract terms are ambiguous, *see, e.g.*, *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000), which is a question of law for the Court to decide on a claim-by-claim basis, *see, e.g.*, *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 197 (2d Cir. 2005); *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of New York*, 375 F.3d 168, 178 (2d Cir. 2004). A contract is unambiguous when it has "'a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable

basis for a difference of opinion.'"  *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir.

2012) (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)).

By contrast, "ambiguity exists where a contract term could suggest more than one

meaning when viewed objectively by a reasonably intelligent person who has examined the

context of the entire integrated agreement and who is cognizant of the customs, practices, usages

and terminology as generally understood in the particular trade or business."  *Bayerische

Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 53 (2d Cir. 2012) (internal quotation

marks omitted).  Ambiguity "can arise either from the language itself or from inferences that can

be drawn from th[e] language."  *Alexander & Alexander Servs., Inc. v. These Certain

Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998).  Further, a court must avoid any

interpretation that would be "'absurd, commercially unreasonable, or contrary to the reasonable

expectations of the parties.'"  *Landmark Ventures, Inc. v. Wave Sys. Corp.*, No. 11-CV-8440

(PAC), 2012 WL 3822624, at *3 (S.D.N.Y. Sept. 4, 2012) (quoting *In re Lipper Holdings, LLC*,

1 A.D.3d 170, 171 (1st Dep't 2003)), *aff'd*, 513 F. App'x 109 (2d Cir. 2013) (summary order).

"If the court determines the operative contract to be ambiguous, it may evaluate the extrinsic

evidence as a matter of law."  *Bank of N.Y. Tr. Co., N.A. v. Franklin Advisers, Inc.*, 726 F.3d

269, 275 (2d Cir. 2013).

Specifically, in the face of ambiguity, courts may consider several types of extrinsic

evidence.  First, courts may turn to "the acts and circumstances surrounding execution of the

ambiguous term," *Roberts v. Consol. Rail Corp.*, 893 F.2d 21, 24 (2d Cir. 1989), including "[t]he

communications of the parties during the negotiation."  *Kepner-Tregoe, Inc. v. Vroom*, 186 F.3d

283, 287 (2d Cir. 1999).  Courts may also consider "[t]he parties' course of conduct under a

contract," *Carol B. v. Sanford B.*, 54 A.D.3d 653, 654 (1st Dep't 2008) (citing *Fed. Ins. Co. v.*

*Americas Ins. Co.*, 258 A.D.2d 39, 44 (1st Dep't 1999)), which is, "'generally speaking, . . . deemed of great, if not controlling, influence,'" *IBJ Schroder Bank & Tr. Co. v. Resol. Tr. Corp.*, 26 F.3d 370, 374 (2d Cir. 1994) (quoting *Old Colony Tr. Co. v. Omaha*, 230 U.S. 100, 118 (1913)).  Finally, "[e]vidence as to custom and usage [as generally understood in the particular trade or business] is to be considered by the court where necessary to understand the context in which the parties have used terms that are specialized." *L. Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010).

Finally, the parties here invoke two relevant principles of construction.  First, the "obligations of a guarantor should be strictly construed," *Dunkirk Tr. Co. v. Schmitt*, 316 F.2d 537, 539 (2d Cir. 1963) (citing *Wesselman v. Engel Co.*, 127 N.E.2d 736, 738 (N.Y. 1955)), and "cannot be extended by construction beyond the plain and explicit language of the contract." *Key Bank of Long Is. v. Burns*, 162 A.D.2d 501, 503 (2d Dep't 1990).  "Guarantees are strictly construed because the guarantor cannot be held responsible to guarantee a performance different from that which he intended or specified in the guaranty." *Chase Manhattan Bank, N.A. v. Am. Nat. Bank & Tr. Co. of Chicago*, 93 F.3d 1064, 1073-74 (2d Cir. 1996) (internal quotation marks omitted).[8]  Second, "ambiguities in contracts should be construed against the drafter." *Albany*

---

[8]     Some courts have interpreted this to mean, as Cohen argues, that a guaranty must be "strictly construed *in favor* of the guarantor." *Flexi-Van Leasing, Inc. v. Isaias*, 23 F. Supp. 2d 419, 422 (S.D.N.Y. 1998) (emphasis added); *see also Levine v. Segal*, 256 A.D.2d 199, 200 (1st Dep't 1998) (noting that "the terms of the guarantee . . . are to be strictly construed in favor of the private guarantor").  Others have held that the rule "requires only that, after the meaning of the contract of guarantee has been determined according to the ordinary principles of contract construction, the obligations undertaken by the guarantor are to be strictly applied . . . [but] a surety is not entitled to any particular tenderness in the interpretation of the language of the contract." *Banco Portugues do Atlantico v. Asland, S.A.*, 745 F. Supp. 962, 967-68 (S.D.N.Y. 1990) (cleaned up)*; see also* Restatement (Third) of Suretyship & Guaranty § 14 (1996) ("There is no special standard of interpretation for contracts creating secondary obligations.").  In light of the Court's conclusion that the extrinsic evidence supports Cohen regardless, the Court need not and does not decide which view of New York law is correct.

*Sav. Bank, FSB v. Halpin*, 117 F.3d 669, 674 (2d Cir. 1997).  Significantly, however, this principle applies "only as a matter of last resort after all aids to construction have been employed without a satisfactory result," *id.*, including "considering relevant extrinsic evidence," *Gillespie v. St. Regis Residence Club, New York Inc.*, 461 F. Supp. 3d 96, 117 (S.D.N.Y. 2020).  Moreover, "the rule is generally not relevant where both parties are sophisticated."  *Banco de La Republica de Colombia v. Bank of New York Mellon*, No. 10-CV-536 (AKH), 2013 WL 3871419, at *7 (S.D.N.Y. July 26, 2013) (citing *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 10 n. 2 (2d Cir. 1983)).

**B.  Analysis**

As noted, the parties' dispute turns on whether the Cohen's full recourse obligations under the Indebtedness and Transfer Provisions were triggered.[9]  CP III contends that the provisions were triggered by the REOA lien, mechanic's liens, and Angotti Judgement lien, and that Cohen breached the Guaranty by failing to pay the outstanding balance of the loan.  Cohen contends that the provisions were not triggered.  The Court will address each provision in turn.

**1.  The Indebtedness Provision**

The Indebtedness Provision provides for full recourse "if Borrower fails to obtain Lender's prior written consent to any Indebtedness (provided such Indebtedness exceeds $250,000.00 or if any such Indebtedness is in the form of mezzanine debt or preferred equity) . . . (to the extent such consent is required under the Loan Agreement[)]."  Guaranty § 1.2(b)(iv).  "Indebtedness" is then defined as "the sum" of "all indebtedness or liability," including

---

[9]     CP III does not allege that any of the *loss* recourse provisions of the Guaranty, including the SPE Provision, were triggered.  *See* Joint Statement § I (referring only to "full-recourse obligations under Section 1.2(b) of the Guaranty.").  Accordingly, the Court need not and does not address that question.

"obligations secured by any Liens, whether or not the obligations have been assumed (other than the Permitted Encumbrances and Permitted Equipment Financing)."  Loan Agmt. § 1.1.

The Second Circuit concluded that a genuine issue of material fact existed as to the meaning of this provision, *Rincon II*, 666 F App'x at 52, and both parties now contend that it is ambiguous, Joint Statement § 1.C.2.  The Court agrees.  Cohen argues that "Indebtedness" refers to the payment obligation itself and that the disputed liens secured obligations for which prior written consent was not necessary or had already been given via the Loan Agreement. Accordingly, he contends that the Guaranty was not breached because there was no "Indebtedness" for which Rincon was required to obtain consent and failed to do so.  By contrast, CP III contends that "Indebtedness" refers to the failure to pay a charge when it becomes due and that the Loan Agreement *did* require Rincon to obtain the lender's consent before failing to pay the obligations that resulted in the disputed liens.  On that score, CP III points (as the Second Circuit did) to the SPE requirements in the Loan Agreement, which prohibit Rincon from taking actions that effect its SPE status, including failing to "pay its debts" as they become due, Loan Agmt. § 1.1, "Special Purpose Entity," (xii), "having indebtedness" of more than $1 million from "liabilities incurred in the ordinary course of business," *id.*, at (xxii) or having "judgments or Liens of any nature against it except for tax liens not yet due and the Permitted Encumbrances," *id.*, at (xliv).  According to CP III, the disputed liens breached those provisions without prior consent and therefore the Guaranty was triggered.  Because the provision "could suggest more than one meaning when viewed objectively," *Bayerische Landesbank*, 692 F.3d at 53, as the parties' arguments demonstrate, it is ambiguous and the Court must look to extrinsic evidence to interpret it, *see Bank of N.Y. Trust Co., N.A*, 726 F.3d at 275.

Ultimately, the Court concludes that the extrinsic evidence favors Cohen's interpretation.[10]  As a preliminary matter, although the provision is ambiguous, several aspects of the text of the Loan Documents indicate that Cohen has the better of the argument.  For starters, Rincon was not required to obtain prior written consent before incurring the obligations underlying the REOA lien, Angotti judgment lien, and mechanic's liens.  Indeed, the Loan Agreement itself contemplated each of the obligations underlying these liens.  *See* Loan Agmt. § 4.1.40 ("Borrower is a party to the REOA and the REOA is in full force and effect"); *id.* § 4.1.40(i) ("[A]ll common charges and other sums due from Borrower under the REOA have been paid."); *id.* § 5.1.24(b) ("Borrower shall pay all charges and other sums to be paid by Borrower pursuant to the terms of the REOA . . . [and] may contest . . . the amount or validity or application in whole or in part of any charges required to be paid by Borrower pursuant to the REOA."); *id.* § 5.1.28 ("Borrower shall diligently and expeditiously . . . renovate all market rate units and common areas."); *id.* Schedule II (requiring Borrower to spend money on "upgrades" for units and renovations to common area).  Moreover, as to the Angotti judgment lien, the Loan Agreement explicitly permits Rincon to challenge "the amount or validity or application" of "Labor and Material costs," which encompasses the dispute that resulted in the Angotti judgment lien.  *See id.* § 5.2.2(b); JX3 § 3.6(b).  Given these provisions, it cannot be said that the underlying obligations required written lender consent.  Alternatively, the provisions themselves can be viewed as the lender giving implicit written consent.

---

[10]     In light of that conclusion, there is no basis to construe the Loan Documents against the drafter, as Cohen argues.  *See Albany Sav. Bank, FSB*, 117 F.3d at 674 (noting that the principle applies "only as a matter of last resort after all aids to construction have been employed without a satisfactory result").  Moreover, as noted, "the rule is generally not relevant where," as here, "both parties are sophisticated."  *Banco de La Republica de Colombia*, 2013 WL 3871419, at *7.

CP III argues that the Angotti judgment lien and REOA lien separately triggered the Guaranty because Rincon did not follow the procedures in the Loan Agreement to contest the charges. The Court disagrees. The Loan Agreement permitted Rincon, "[a]fter prior written notice to Lender," to "contest by appropriate legal proceeding . . . the amount or validity or application in whole or in part of any Labor and Material Costs," subject to certain requirements, including that Rincon "furnished the security as may be required in the proceeding by applicable law." JX3 § 3.6(b); Loan Agmt. § 5.2.2(b). The REOA charges were similarly contestable under the Loan Agreement. *See* Loan Agmt. § 5.1.24(b). CP III contends that Rincon failed to follow the procedures prescribed by the Loan Agreement for contesting these charges, and that may be true. For example, Rincon may have failed to provide CP III with "prior written notice" when contesting the liens. *See* PX73 at 2 (stating that the lender "ha[d] not received written notice of the Borrower's contest of these Liens"); *see also* Tr. 57 (Cohen testifying that he was "not aware" of whether Rincon complied with the Loan Agreement's requirements in contesting the charges that became the Angotti judgment lien); Tr. 70-71 (Cohen testifying that "institut[ing] any type of proceeding" to contest the REOA charges "was never accomplished"). But the Indebtedness Provision requires consent only as to the *obligation* secured by the lien, not the lien itself. Here, because there was consent — to the extent it was required — to the obligations underlying the Angotti and REOA liens, these liens could not trigger the Indebtedness Provision.

Turning to the extrinsic evidence of the parties' intent, the parties' communications during negotiation of the Loan Documents also support Cohen's position that the liens at issue were not intended to trigger full recourse liability. The parties agreed at the outset that Rincon would renovate the property, and in fact, the Loan Agreement required Rincon to spend money

on the renovations.  *See* Loan Agmt. §§ 5.1.28, 7.1.1, Schedule II.  Because any contractor could unilaterally record a mechanic's lien against the Property for renovating expenses envisaged by the Loan Agreement, it is unlikely that such a lien would constitute indebtedness that triggered the Guaranty.  Similarly, the parties agreed during negotiations to strike the Failure-to-Pay Provision from the Guaranty.  Black Aff. ¶¶ 22-23.  Concerns about failure to pay charges were then addressed, albeit more narrowly, via the SPE Provision in the Guaranty and the corresponding requirements in the Loan Agreement, as discussed further below.  The fact that those issues are explicitly addressed via a different provision, which provides for loss recourse rather than full recourse, further supports the conclusion that the same charges were not intended to trigger the Indebtedness Provision.

     That interpretation is also supported by contemporaneous documents indicating the parties' intent as to the Guaranty.  Bear Stearns' Commitment Committee Memorandum and closing statement both indicate that the loan was intended to be non-recourse except for specific carveouts.  *See* JX18 at 26; JX23 at 7-8.  Similarly, the opinion letter from Rincon's counsel concluded that the lender was not permitted to "invoke penalties (or other remedies) for defaults that bear no reasonable relation to the damage suffered or that would otherwise work a forfeiture."  JX25 at 9472.  Allowing a "failure to pay" routine charges to trigger full recourse liability via the Indebtedness Provision would not be consistent with these understandings.  *See* McInerney Dep. Tr. 163-64 (Bear Stearns's counsel confirming that it was not his practice "to agree, on behalf of [his] client as a lender, to take out a recourse trigger but then have it put into another section of the Loan Agreement without specifically discussing that with the borrower" and that he did not "intend to do that in this case"); *see also D.B. Zwirn Special Opportunities Fund, L.P. v. SCC Acquisitions, Inc.*, 74 A.D.3d 530, 553 (1st Dep't 2010) ("If the parties had

intended to make defendant liable upon being in financial distress, language stating the same could have easily been included in the guarantees.  Here, the guarantees did not include such language and the parties signed carve-out guarantees, rather than general guarantees.").  And lastly, although it is not extrinsic evidence of the *drafting* parties' intent per se, it is worth noting that Carmel Partners, a party familiar with the industry, when deciding to acquire the loan, also understood the loan to be nonrecourse with only a limited guaranty.  *See* JX32 at 764 (Carmel Partner's pre-purchase analysis noting that the loan was "non-recourse with the exception of 'Bad Acts' including fraud, misapplication of funds, obtaining subordinate financing, filing for voluntary bankruptcy, and environmental, etc.").

Finally, Cohen's interpretation is also supported by the parties' course of conduct. Rincon kept BlackRock apprised of the dispute with Angotti, *see* Joint Stip. ¶¶ 104-05, and the lender took no action indicating that it thought the Guaranty had been triggered.  The same is true of Rincon's failure to pay the disputed REOA charges.  *See* Joint Stip. ¶¶ 67-71, 73, 75, 78, 80 (documenting discussions between Rincon and BlackRock about the REOA dispute in January, May, July, and September of 2009).  Indeed, even when the lender informed Rincon that it believed Rincon to be in breach of the Loan Agreement because it had failed to pay the principal by the maturity date, it made no reference to the Guaranty (beyond passing references to breach of "the loan documents" and form language "reserv[ing] the right to pursue remedies" under "any guaranties"), *see* JX31 at 1; PX73, despite being fully aware of the mechanic's liens and REOA lien, *see* JX81.  In fact, the lender made no specific reference to the Guaranty until April 2010, *after* Carmel Partners had agreed to acquire the Property, *see* JX83, perhaps at the direction of Carmel Partners itself, *see* DX34.  Even then, the Indebtedness Provision was not mentioned until CP III's first letter to Rincon in May 2010, after the loan was acquired.  JX85.

The lender's failure to assert any specific breach of the Guaranty between June 2009 and April 2010 is evidence of "the practical interpretation of a contract by the parties to it for [a] considerable period of time before it comes to be the subject of controversy." *IBJ Schroder Bank & Tr. Co.*, 26 F.3d at 374 (internal quotation marks excluded). Such evidence "is deemed of great, if not controlling, influence" in ascertaining the intent of the parties. *Id.*[11]

CP III's counterargument — premised on the fact that the SPE Provision required Rincon to obtain the lender's "consent" before taking actions that affect its SPE status, including failing to "pay its debts" as they became due, Loan Agmt. § 1.1, "Special Purpose Entity," (xii), "having indebtedness" of more than $1 million from "liabilities incurred in the ordinary course of business," *id.*, at (xxii) or having "judgments or Liens of any nature against it except for tax liens not yet due and the Permitted Encumbrances," *id.*, at (xliv) — is unpersuasive. First, by its terms, the Indebtedness Provision encompasses *all* indebtedness, not only that which is "past due." Indeed, the provision makes no reference to charges that are "past due," even though other parts of the Loan Agreement explicitly do. *See* Loan Agmt. § 2.3.4 (imposing a penalty if "any principal, interest or any other sums due under the Loan Documents . . . are not paid by Borrower on or prior to the date on which it is due"); *id.* § 10.5 (stating that "by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Lender shall not be deemed to have waived any right"). That supports the conclusion that prior consent is required only as to the obligation itself and not for a failure to pay charges

---

[11]     To be clear, the lender's failure to assert a breach of the Guaranty earlier does not constitute a waiver of rights under the Guaranty. *See* Loan Agmt. § 8.3; *see also CP III Rincon Towers, LLC v. Cohen*, No. 10-CV-4638 (JMF), 2021 WL 5771878, at *2 (S.D.N.Y. Dec. 6, 2021) (ECF No. 203) (holding that Cohen is estopped from arguing that the lender's failure to assert the liens as an event of default prior to April 2010 modified the Loan Agreement). Nevertheless, it is evidence of the parties' understanding of the relevant provisions of the Loan Documents.

when they become due.  *See, e.g.*, *U.S. Fidelity & Guar. Co. v. Annunziata*, 67 N.Y.2d 229, 233 (1986) (noting that omission of a term in one provision of a contract that is included in another provision "must be assumed to have been intentional under accepted canons of construction").

Second, the Guaranty explicitly provides for *loss* recourse for "failure by the Borrower to maintain its status as a Single Purpose Entity" via the SPE Provision.  Guaranty § 1.2(vi).  That provision is triggered by a failure to meet the exact same SPE requirements that CP III cites in the Loan Agreement.  Significantly, the parties negotiated to change the SPE Provision from full recourse in the initial draft to loss recourse in the final Loan Agreement.  *See* JX11 at 1267; Black Aff. ¶ 22.  To hold that noncompliance with the SPE requirements nonetheless triggers full recourse liability via the Indebtedness Provision would therefore be contradictory and contrary to the parties' intent.  *See, e.g.*, *Amtrust N. Am., Inc. v. Kf&B, Inc.*, No. 17-CV-5340 (LJL), 2020 WL 6306444, at *30 (S.D.N.Y. Oct. 27, 2020) (noting that a court "is required . . . to read terms of a contract in harmony so that they are consistent with one another" and should *not* "interpret a contract to require in one provision what it is implicitly forbidden in another").  Similarly, CP III points to the fact that the SPE requirements provide that Cohen will not be required to make "additional capital contributions" to Rincon.  Loan Agmt. § 1.1, "Special Purpose Entity," (xii) ("[P]rovided, however, that the foregoing shall not require the members of Borrower to make additional capital contributions to Borrower." (emphasis omitted)).  CP III argues that because of this limitation, the Indebtedness Provision in the Guaranty provided a necessary incentive for Cohen to ensure Rincon's debts were paid, even if he was not required to contribute more capital to Rincon.  *See* Tr. 116.  But the Guaranty's SPE Provision, which enforces the SPE

requirements by providing for loss recourse where those requirements are not met, provides the same incentive.[12]

Finally, it would be absurd if $250,000 of indebtedness could trigger *full* recourse liability under the Indebtedness Provision, when four times as much indebtedness — $1 million — triggers only *loss* recourse under the SPE Provision. *See In re Lipper Holdings*, 1 A.D.3d 170, 171 (1st Dep't 2003) ("A contract should not be interpreted to produce a result that is absurd."). Similarly, CP III's contention that Rincon must *always* obtain consent before failing to "pay its debts" under (xii) of the SPE requirements, renders superfluous the Indebtedness Provision, which is triggered by a lack of consent *only* "to the extent such consent is required under the Loan Agreement." *See* Tr. 125 ("THE COURT: [I]f the borrower had received a $300,000 bill from a contractor payable on December 15th and they didn't pay it until December 17th, so it was past due, and they didn't obtain written consent to pay it late, it's your view that that would trigger the indebtedness provision and full recourse? COUNSEL: It could trigger the indebtedness provision and full recourse as we read the documents, yes, it could."). Under CP III's approach, *any* failure to pay a debt of more than $250,000 could trigger full recourse liability — even though the parties agreed that the loan was "non-recourse" except for specific carve-outs. *See* JX18 at 26; JX23 at 7-8. As the Second Circuit previously noted, commercial reasonableness *alone* cannot resolve the ambiguities in the Guaranty. *See Rincon II*, 666 F

---

[12]    That is not to say that interpreting the Indebtedness Provision as CP III proposes would render the SPE Provision superfluous because, as Judge Batts and the Second Circuit noted, there are many additional requirements for maintaining SPE status. *See Rincon II*, 666 F. App'x at 55 n.8. But that observation does not provide affirmative evidence in support of construing violations of the Loan Agreement's SPE requirements to trigger full recourse through the back door of the Guaranty's Indebtedness Provision. CP III points to no evidence of such intent.

App'x at 54 n.6.  But here, the extrinsic evidence and commercially reasonable interpretation point to the same result.[13]

In sum, the Court has now done what the Second Circuit directed on remand, namely "fully consider the interaction between" the Indebtedness Provision and "the special purpose entity provisions of the Loan Agreement."  *Rincon II*, 666 F. App'x at 54.  The interaction between those provisions may render the Guaranty ambiguous, but the overwhelming extrinsic evidence supports the same conclusions that Judge Batts reached in her decision on summary judgment: that Rincon "was not required to obtain Lender's prior written consent before incurring" the charges underlying the liens at issue and, as a result, "the Guaranty's Indebtedness Provision was not triggered."  *Rincon I*, 13 F. Supp. 3d at 325.  These conclusions are reinforced by the fact that the Court must "strictly construe[]" Cohen's obligations under the Guaranty.  *Dunkirk Tr. Co.*, 316 F.2d at 539.  Accordingly, and for the reasons stated above, the Court holds that the Indebtedness Provision of the Guaranty was not triggered.

## 2.  The Transfer Provision

That leaves the Transfer Provision, which provides for full recourse "if Borrower fails to obtain Lender's prior written consent to any [t]ransfer if required by the Loan Agreement or the Deed of Trust."  Guaranty § 1.2(b)(v).  The Loan Agreement defines "Transfer" broadly as "sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or

---

[13]     At trial, CP III also argued, albeit briefly, that because the Loan Agreement states that there can be no "modification, amendment, extension, discharge, termination or waiver of any provision of" the agreement or "consent to any departure by Borrower therefrom" unless it is "in a writing signed by the party against whom enforcement is sought," Loan Agmt. § 10.4, *any* breach of the Loan Agreement requires prior written consent.  Tr. 119.  That position is unpersuasive for the same reason that CP III's interpretation of the SPE requirements is unpersuasive — because it would effectively turn a non-recourse loan with specific, limited carveouts, into a full recourse loan, contrary to the parties' intent.

otherwise transfer or dispose of."  Loan Agmt. § 5.2.10(b)(i).  CP III contends that all liens, whether voluntary or involuntary, constitute a Transfer within the meaning of the Provision because all liens "encumber" the Property.  Cohen contends that such an interpretation would render superfluous the Voluntary Lien Provision of the Guaranty, which provides for full recourse only "if Borrower fails to obtain Lender's prior written consent to any . . . voluntary Lien encumbering the Property (to the extent such consent is required under the Loan Agreement[)]."  Guaranty § 1.2(b)(iv).  Cohen argues that the better interpretation is that the definition of "Transfer" does not encompass liens at all.

Citing the interplay between the Transfer Provision and the Voluntary Lien Provision, the Second Circuit concluded that this provision is ambiguous and remanded for consideration of extrinsic evidence.  *See Rincon II*, 666 F App'x at 52-54; *see also* Joint Statement § I.B.1.  At the conclusion of trial, however, CP III conceded that there was no extrinsic evidence supporting its interpretation.  Tr. 138 ("As I stand here, I'm not aware of any extrinsic evidence in the way of negotiations, communications and the like on the transfer language of the documents . . . I don't believe that there's any extrinsic evidence that specifically addresses the transfer [provision].").  Given the Second Circuit's ruling, and the fact that CP III, as Plaintiff, bears the burden of proof, that concession alone arguably dooms its case.  *Cf. Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 159 (2d Cir. 2000) (noting that a court may resolve contractual ambiguity "as a matter of law if there is no extrinsic evidence to support one party's interpretation of the ambiguous language or if the extrinsic evidence is so-one sided that no reasonable factfinder could decide contrary to one party's interpretation").  In any event, what extrinsic evidence there is supports Cohen's interpretation.

First, although the Guaranty is ambiguous, several aspects of the text itself suggest that "Transfer" is not intended to include the liens at issue.  In general, courts "should not adopt an interpretation which will operate to leave a provision of a contract without force and effect." *Corhill Corp. v. S. D. Plants, Inc.*, 9 N.Y.2d 595, 599 (1961) (internal quotation marks omitted).  Yet as Cohen argues, and the Second Circuit held, reading "Transfer" to encompass *all* liens would render the Voluntary Lien Provision meaningless.  *See Rincon II*, 666 F. App'x at 52.  It is also notable that the definition of "Transfer" in the Loan Agreement does not explicitly refer to liens even though liens are addressed elsewhere in the Loan Agreement — in some instances, alongside "encumbrances," thereby suggesting that "liens" and "encumbrances" were intended to have different meanings.  *Compare* Loan Agmt. § 5.2.10(b) *with id.* § 6.4(b)(ii)(B) (referring to "liens or encumbrances of any nature") and *id.* § 4.1.3 (referring to "any lien, charge or encumbrance"); *see also id.* § 7.1.2(d) (referring to "all liens, claims and other encumbrances").  It is true that the Loan Agreement defines "Lien" to include "any other encumbrance."  *Id.* § 1.1.  "Encumber" and "encumbrances," however, are not defined terms in the Loan Documents, and it does not follow that the word "encumber" in the definition of Transfer should be similarly defined broadly to include all liens.

Indeed, other provisions in the Loan Agreement suggest that not all "encumbrances" are "Transfers."  *See id.* § 8.1(a)(iv) (stating that it is a default "if Borrower Transfers *or otherwise encumbers* any portion of the Property" (emphasis added)).  Similarly, the other actions listed in the definition of "Transfer" — including "sell," "mortgage," "convey," and "grant options with respect to" — suggest that the parties intended "encumb[rances]" to mean something more substantial than the liens at issue here.  *See 242-44 E. 77th St., LLC v. Greater New York Mut. Ins. Co.*, 31 A.D.3d 100, 104 (1st Dep't 2006) (applying the "rule of construction" that "a series

of specific words describing things or concepts of a particular sort are used to explain the meaning of a general one in the same series" to interpret a contract provision).  Finally, the interpretation that CP III urges — that *all* liens are transfers — produces a result that is "absurd" and "commercially unreasonable," an outcome that should be avoided.  *See In re Lipper Holdings*, 1 A.D.3d at 171.  If CP III's interpretation were adopted, *any* lien recorded against the property —even if for a dollar or if fraudulent —would trigger full recourse liability under the Guaranty.[14]  And notably, under California law, a mechanic's lien may be filed as soon as work is commenced on the property, even before an invoice is past due.  *See* Cal. Civ. Code § 8414.  Allowing any such a lien to trigger full recourse liability would clearly be contrary to the parties' expressed intent for the Loan Agreement to be "*non*-recourse to Borrower . . . with Lender's standard carveouts."  DX1 at 3 (emphasis added).  Indeed, such a reading would effectively convert the loan into a nearly full recourse loan.  *See* Stein Aff. ¶ 45 (explaining that in an ordinary non-recourse loan, "carveouts are intended solely to control the borrower, not to shift ordinary credit risks to the guarantor"); *id.* ¶ 52 ("For Lender to say that nonpayment of ordinary/expected/anticipated operating costs triggers Full Recourse is very unusual and inconsistent with ordinary expectations of nonrecourse financing.").

Turning from the text to extrinsic evidence of the parties' intent, the Court once again places significant weight on the fact that the parties agreed during negotiations to strike the Failure-to-Pay Provision from the Guaranty.  Black Aff. ¶¶ 22-23.  Bear Stearns' initial inclusion of that provision is an indication that it did not believe the Transfer Provision, which was also in

---

[14]     For example, the Allsite liens, upon which CP III relies, sought payment for services completed by VCS, another contractor and former business partner of Allsite's, *for which VCS had already been paid*.  Joint Stip. ¶¶ 108-10; *see also Rincon I*, 13 F. Supp. 3d at 323.  After Rincon contacted counsel for VCS, the claims were released.  Joint Stip. ¶ 111.

the initial draft, would cover such charges.  And again, while some of these same charges are addressed in the final draft via the SPE requirements in the Loan Agreement, all of the extrinsic evidence demonstrates that the parties intended breaches of the SPE requirements to trigger *loss* recourse, not *full* recourse.  In its decision, the Second Circuit concluded that although the decision to delete the Failure-to-Pay Provision "reflects that the parties did not intend Borrower's failure to pay for labor, materials or other charges, which failure could generate a lien against the Property as a matter of state law, to operate as a full recourse trigger," it "does not reflect whether the Transfer Clause applies to liens not covered by [that provision], such as the liens entered pursuant to the Angotti judgment and the terms of the REOA." *Rincon II*, 666 F. App'x at 53.  But taking into account all of the extrinsic evidence, it would make little sense to conclude that the definition of "Transfer" encompasses some liens — the Angotti judgment lien and the REOA lien — but not others, such as voluntary liens and mechanic's liens.  CP III points to no evidence that the parties intended such a fractured result and does not offer any intelligible way to distinguish between liens that are covered and those that are not.

Moreover, additional evidence not considered by the Second Circuit indicates that the Angotti judgment lien and the REOA lien were not intended to be treated as "Transfers."  As noted above, the Loan Agreement explicitly permits Rincon to challenge "the amount or validity or application" of "Labor and Material costs," which encompasses the dispute that resulted in the Angotti judgment lien.  *See* Loan Agmt. § 5.2.2(b); JX3 § 3.6(b).  And the Loan Agreement gives Rincon the same right to contest REOA charges.  *See* Loan Agmt. § 5.1.24(b).  These rights — at least the first of which was explicitly bargained for, *see* Black Aff. ¶¶ 14, 27, 30 — would be rendered largely meaningless if the borrower's decision to contest the charges could result in a lien that would trigger full recourse liability under the Guaranty.  In addition, as noted,

contemporaneous documents indicate the parties' intent to create a *non-recourse* loan with specific, limited carveouts.  *See* JX18 at 26 (Bear Stearns' Commitment Committee Memorandum indicating loan is non-recourse); JX23 at 7-8 (closing statement indicating the same); *see also* JX25 at 9472 (opinion letter from Rincon's counsel concluding that the lender was not permitted to "invoke penalties (or other remedies) for defaults that bear no reasonable relation to the damage suffered or that would otherwise work a forfeiture").

Finally, the parties' course of dealing supports the conclusion that the Transfer Provision was not triggered.  *See Carol B.*, 54 A.D.3d at 654 ("The parties' course of conduct under a contract is persuasive evidence of their agreed intention.").  Rincon kept CP III's predecessor apprised of the dispute over the REOA lien, *see* Joint Stip. ¶¶ 67-71, 73, 75, 80-81, and the mechanic's liens, *see id.* ¶¶ 104-05.  In January 2010, an internal BlackRock email indicates BlackRock was aware of the liens, understood them to be subject to arbitration, and took the position at that time that "there [was] no need to bond [the liens] over."  JX81.  In fact, the lender never suggested that the Transfer Provision of the Guaranty had been triggered — even after claiming that Rincon had breached the Loan Agreement, JX31 at 82, — until CP III agreed to purchase the loan.  Only then, the day before CP III acquired the loan, did the lender indicate to Rincon for the first time that there had been a "Transfer of the Property in breach of Section 5.2.10 of the Loan Agreement" as a result of the mechanic's liens and REOA lien recorded against the Property.  JX83 at 339.  And notably, when CP III itself wrote to Rincon to press its rights under the Guaranty after acquiring the loan, it stated that the Guaranty was triggered by "unpermitted Indebtedness and Liens," and did not even refer to a "Transfer."  JX85 at 23088.

In sum, on a complete record, the evidence validates the conclusion that Judge Batts reached, albeit perhaps prematurely, in her decision on summary judgment: that "Bear Stearns,

Rincon, and Cohen never intended for the [liens at issue] to trigger [Cohen's] full recourse liability under the Transfer Provision." *Rincon I*, 13 F. Supp. 3d at 324.  More to the point, although the Second Circuit concluded that the evidence on which Judge Batts relied did not rule out CP III's proffered interpretation of the Guaranty and remanded to give CP III an opportunity to point to extrinsic evidence in favor of that interpretation, CP III failed to take advantage of that opportunity.  As a result, the overwhelming weight of the evidence supports Cohen's argument that the liens at issue did not trigger full recourse liability under the Transfer Provision. For these reasons, *and* because the Court is obligated to "strictly construe[]" Cohen's obligations under the Guaranty, *Dunkirk Tr. Co.*, 316 F.2d at 539, the Court concludes that Cohen did not breach the Transfer Provision of the Guaranty either.

## CONCLUSION

For the foregoing reasons, the Court concludes that the parties agreed to a nonrecourse loan with limited carveouts and never intended for the liens at issue here to trigger Cohen's full recourse liability under the Guaranty.  Accordingly, the Clerk of Court is directed to enter judgment in favor of Cohen and close this case.

SO ORDERED.

Dated: January 6, 2022
      New York, New York

_____
JESSE M. FURMAN
United States District Judge